UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD, individually and on behalf of others similarly situated,<br><br>　　Plaintiffs,<br><br>vs.<br><br>JUMP TRADING, LLC; JUMP CRYPTO HOLDINGS LLC; and TAI MO SHAN LIMITED,<br><br>　　Defendants. | Case No.:<br><br><br>CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL |

Plaintiffs AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD ("Plaintiffs"), on behalf of themselves and others similarly situated ("the Class"), bring this action against Defendants JUMP TRADING, LLC ("Jump Trading"); JUMP CRYPTO HOLDINGS LLC ("Jump Crypto"); and TAI MO SHAN LIMITED ("Tai Mo Shan") (collectively, "Jump") for actual damages suffered by Plaintiffs and the Class and for other recovery specified herein, and allege upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record, as follows:

## **INTRODUCTION**

1. This case arises from Jump's wrongful taking of tens of millions of dollars' worth of investors' funds in May 2022. Plaintiffs and the Class, which is composed of thousands of investors, were holders of the algorithmic stablecoin TerraUSD ("UST"). UST was one of the tokens within the Anchor Protocol ecosystem created by Terraform Labs Pte. Ltd. ("Terraform") and was supposedly pegged in value to the U.S. dollar.

2. Beginning in 2019, Jump began to quietly position itself at the center of the Anchor Protocol ecosystem, entering into a series of written and unwritten agreements with Terraform and others to supply liquidity for UST transactions, to serve as UST's market-maker, and to help UST maintain its one-dollar "peg." Jump undertook these obligations for the explicit benefit of investors. In exchange, Terraform offered Jump options to buy other Terraform assets at deep discounts, ultimately generating more than a billion dollars in profit for Jump.

3. In May 2022, a UST de-peg triggered a death spiral, as UST rapidly lost its value and plummeted toward zero. Jump was the sole liquidity provider and market maker for UST investors like Plaintiffs, who purchased UST through companies that provided digital "wallet" services ("Wallet Apps"). In this role, Jump was obligated to continuously post bid and ask quotes for UST's price. But when Plaintiffs and investors attempted to redeem their UST for U.S. dollars at Jump's quoted price, Jump refused to authorize the debits and went dark, leaving Plaintiffs and the Class locked in their investments with no counter party to fill orders even at reduced prices.

1

4.     UST's price plummeted, largely because of Jump's unwillingness to fill investor sell orders. The collapse wiped out $40-$50 billion of investor funds. Jump's intentional withholding of the funds it held for Plaintiffs' benefit and its refusal to honor its obligations caused Plaintiffs and the Class to lose as much as 90 percent of their UST-linked investments, even as Jump retained its discounted profits and the proceeds from the investors' UST purchases.

5.     Plaintiffs assert claims under Illinois law for breach of contract as third-party beneficiaries, as Jump explicitly recognized that its liquidity services were intended to benefit UST investors. Plaintiffs further assert claims for conversion, unjust enrichment, and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2, seeking to recover the losses suffered by Plaintiffs and the Class and to reclaim the money wrongfully taken by Jump.

**JURISDICTION AND VENUE**

6.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act), because this is a class action in which (a) the proposed Class contains at least 100 members, (b) the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (c) at least one Class member is a citizen of a different state than at least one Defendant.

7.     This Court has personal jurisdiction over Jump because it is headquartered in this District, conducts substantial business here, committed substantial portions of the misconduct alleged in this Complaint from this District, and purposely availed itself of this forum. Defendants Jump Trading and Jump Crypto are headquartered in Chicago. Defendant Tai Mo Shan is headquartered in the Cayman Islands. Defendant Tai Mo Shan conducted all its business activities in Chicago and was, as alleged herein, the alter ego of Defendants Jump Trading and Jump Crypto.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, this District is the principal place of business for some or all of the Defendants, and key witnesses and documents are located here.

2

## THE PARTIES

### Plaintiffs

9. **Plaintiff Austin Ward** is, and at all relevant times was, a resident of the state of California. Plaintiff Ward held UST through a Wallet App on May 9, 2022. On May 9, 2022, he attempted to redeem the UST he held in exchange for U.S. dollars. His sell orders were denied because Jump refused to provide the liquidity necessary to fill the orders. His redemption orders were never filled. He lost more than 90 percent of his investment as a consequence of Jump's refusal to fill his orders.

10. **Plaintiff David Krevat** is, and at all relevant times was, a resident of the state of Florida. Plaintiff Krevat held UST through a Wallet App on May 9, 2022. On May 9, 2022, he attempted to redeem the UST he held in exchange for U.S. dollars. His redemption orders were denied because Jump refused to provide the liquidity necessary to fill the orders. His redemption orders were never filled. He lost more than 90 percent of his investment as a consequence of Jump's refusal to fill his orders.

11. **Plaintiff Nabil Mohamad** is, and at all relevant times was, a resident of the state of Washington. Plaintiff Mohamad held UST through a wallet service provider on May 9, 2022. On May 9, 2022, he attempted to redeem the UST he held in exchange for U.S. dollars. His redemption orders were denied because Jump refused to provide the liquidity necessary to fill the orders. His redemption orders were never filled. He lost more than 90 percent of his investment as a consequence of Jump's refusal to fill his orders.

### Defendants

12. **Defendant Jump Trading, LLC** is a Delaware limited liability company with its principal place of business in Chicago, Illinois, and is one of the world's largest private trading firms, with a crypto trading arm that served as the primary market maker and liquidity provider for UST and other Terra ecosystem tokens. Jump Trading conducted business relevant to this matter through various alter ego entities, including Defendants Jump Crypto and Tai Mo Shan.

13. **Defendant Jump Crypto Holdings LLC** is a Delaware limited liability company with its principal place of business in Chicago, Illinois, and is the corporate parent for many of

3

Jump Trading's crypto-related entities and activities, including those at issue in this case. Jump Crypto was officially started in September 2021 by Jump Trading. At all relevant times, Jump Crypto was under direction of personnel who were employees or principles of Jump Trading, including Jump Trading's co-founder and owner Bill Disomma, who, according to testimony from Jump Trading personnel, "ran the team" at Jump Crypto. Jump Crypto conducted business relevant to this matter through various alter ego entities, including Defendants Jump Trading and Tai Mo Shan.

14. **Defendant Tai Mo Shan Limited** is a Cayman Islands corporation based in Grand Cayman, Cayman Islands and is a wholly owned subsidiary of Jump Crypto. At all relevant times, Tai Mo Shan conducted all its relevant business operations in the United States and in this judicial district and was the alter ego of Jump Trading and Jump Crypto.

15. At all relevant times, and as is alleged further herein, Defendants Jump Trading, Jump Crypto, and Tai Mo Shan acted as a single enterprise and were alter egos of one another.

16. At all relevant times, Tai Mo Shan had a unity of interest and ownership with Jump Trading and Jump Crypto and was a mere instrumentality and business conduit for Jump Trading and Jump Crypto. Jump Trading personnel, including Jump Trading Director Takashi ("Tak") Fijushima and Jump Trading General Counsel Matthew Hinerfeld, acted in a dual capacity as representatives, directors, executives, agents, or employees of Jump Trading and Tai Mo Shan. Similarly, Jump Crypto personnel, including Jump Crypto President Kanav Kariya and Mr. Hinerfeld, acted in a dual capacity as representatives, directors, executives, agents, employees, and personnel of Jump Crypto and Tai Mo Shan. At all relevant times, Tai Mo Shan employed no individuals other than persons who were also employees of Jump Trading, Jump Crypto, or other Jump entities. To the extent Tai Mo Shan had separate officers or directors, they held nominal positions only and acted instead in the interest and for the benefit of other entities, including Jump Trading and Jump Crypto.

17. Fraud and injustice would result if these entities were treated separately, as Jump Trading and Jump Crypto would escape liability for the conduct of Tai Mo Shan, an entity they controlled and that was acting on their behalf. Jump Trading and Jump Crypto's relevant

4

obligations arose from agreements entered into by Tai Mo Shan, acting in its capacity as Jump Trading and Jump Crypto's alter ego. Tai Mo Shan's assets and liabilities were co-mingled with those of Jump Trading and other Jump entities including J Digital 6 Cayman Ltd., a Cayman Islands corporation; JCDP-7QP LLC, a Delaware corporation with its principal place of business in Chicago, Illinois; Jump Operations LLC, a Delaware corporation with its principal place of business in Chicago, Illinois; and Jump Capital LLC, a Delaware corporation with its principal place of business in Chicago, Illinois.

## FACTUAL ALLEGATIONS

### Cryptocurrency and Stablecoins

18.     For most of the last 75 years, the role of technology in banking and finance was limited to the behind-the-scenes infrastructure that supports money transfers and the stock market. Now, banking and financial services companies use financial technology, or "FinTech," applications for a wide array of services, including consumer-facing mobile banking, peer-to-peer payment services, and automated trading platforms.

19.     Cryptocurrency is another outgrowth of FinTech. It was originally conceived as a supply of digital money, called "tokens," that buyers and sellers could use to transact goods and services, much like fiat currency. All transactions using cryptocurrency tokens are encrypted and recorded in "blocks" across a network of different computer servers called a "blockchain." In theory, the blockchain concept allows a marketplace where individual participants can remain anonymous, but all transactions are recorded publicly and visible to all. It also operates independent of banks, which many cryptocurrency enthusiasts see as corrupt.

20.     Many of the most popular cryptocurrencies are highly volatile, fluctuating in value by more than 100 percent in a single year, making them an inefficient means of exchange. They have thrived, however, as investment vehicles. While they were once considered exotic and novel, investors now treat them as mainstream. In a September 2022 committee hearing, Sen. Dick Durbin described the state of the cryptocurrency market as "an industry where one in five Americans now has invested and had some risk—and we're now getting into retirement accounts

5

and 401(k)s and the like, and the major brokers like Fidelity and others are starting to include this in their plan."

21.     In 2014, several companies began issuing a class of cryptocurrency called "stablecoins." As the name suggests, stablecoins are intended to offer investors stability in the otherwise volatile digital asset market. Stablecoins differ from other cryptocurrencies because, where a typical cryptocurrency's value is based on the market for the asset itself, a stablecoin's value is "pegged" to the value of another financial instrument, like the U.S. dollar or gold. This gives stablecoins greater price stability than other digital assets.

22.     Generally, the issuers of stablecoins assure investors that their assets will hold their pegs by keeping reserves of the underlying asset. For example, Circle, the issuer of the dollar-pegged USD Coin (USDC), holds dollar-denominated reserves that are at least equal to, and typically slightly greater than, the total USDC in circulation (in one recent disclosure, approximately 33 billion USDC are in circulation and are backed by approximately $33.1 billion of reserves). Thus, Circle can guarantee that any time a holder of USDC wishes to "sell" their tokens, they will be able to do so at a price of $1 per token.

### The Anchor Protocol and UST

23.     Terraform was a private digital asset company co-founded by Korean national Do Kwon and headquartered in Singapore. It was founded in 2018 with the goal of creating a decentralized financial ecosystem using blockchain technology. It was the developer of the Terra blockchain, which supported a suite of algorithmic stablecoins, the most notable being the UST stablecoin.

24.     Unlike traditional stablecoins backed by actual fiat currency reserves, UST was designed to maintain a $1 peg through an algorithmic relationship with another cryptocurrency called Luna. This system relied on an algorithmic mechanism where UST and Luna tokens were exchanged to stabilize UST's value without direct dollar backing. The algorithm was designed to incentivize traders to keep the price of UST pegged at $1. If the market price of UST dropped below $1, traders could buy UST at that price and exchange each UST for $1 worth of Luna by "burning" the UST and "minting" the Luna. This would reduce the supply of UST, causing its

price to increase until it reached $1. If the market price of UST rose above $1, then traders could profit by doing the reverse trade: they would buy $1 worth of Luna, use it to mint 1 UST, and then sell that UST on the market for more than $1, capturing a profit. Minting the UST would increase the supply of UST, which would put downward pressure on UST's price until it fell back to $1 and the arbitrage opportunity would close.

25.     Terraform's flagship product was its "Anchor Protocol." The Anchor Protocol was designed to function on the Terra blockchain like a high-yield savings account. It allowed users either to deposit UST into the Anchor Protocol and earn interest on that deposit, or to borrow UST by posting collateral and paying interest on that loan. The Anchor Protocol generated interest for UST deposits by collecting interest from UST borrowers. Investors who deposited UST in the Anchor Protocol earned up to 20 percent annual interest on those deposits.

26.     The Anchor Protocol attracted many retail and institutional investors, driving Luna's market cap to over $40 billion and making UST the third-largest stablecoin by market capitalization.

27.     Terraform raised over $200 million from prominent investors and entered high-profile partnerships, such as a sponsorship deal with the Washington Nationals baseball team. Do Kwon, who was named Terraform's CEO, became a well-known figure in the crypto space, promoting confidence in the Terra ecosystem's algorithmic model despite warnings from critics about its sustainability.

28.     The Anchor Protocol's success depended on an inflow of UST depositors and funds. The more money that was deposited into the system, the more it could lend to its borrowers and the longer it continued to offer UST depositors such exceptional returns. The financial success of UST depositors was dependent on the ability of Anchor Protocol's designers to successfully implement the protocol and on the ability of those promoting and selling UST to continue to increase the inflow of investment to the protocol.

**Digital Wallet Apps and Banking Rails for UST Investors**

29.     Digital Wallet Apps are computer applications that allow retail investors to store, send, receive, and exchange digital assets such as cryptocurrencies, functioning similarly to an online banking app but for digital currencies.

30.     When an investor uses a Wallet App, they connect it to a funding source like a bank account and deposit funds into the Wallet App account. The Wallet App invests the funds into yield-bearing digital asset investments, providing the yield to the Wallet App user (minus a portion of the yield taken as a fee by the Wallet App).

31.     The Anchor Protocol was a popular investment vehicle for Wallet Apps. Because UST was pegged to the U.S. dollar, it was expected to be inherently stable. Moreover, Wallet Apps could stake UST tokens in the Anchor Protocol, where they could earn interest returns as high as twenty percent annually. UST's stability and high yields made it an attractive option for Wallet Apps and made Wallet Apps attractive to investors who wanted to hedge against cryptocurrency's wild volatility.

32.     Wallet Apps that integrated UST into their products included the Kash wallet, a product of the Colorado-based Intellabridge. When a Kash user deposited U.S. dollars (or other assets) into their Kash wallet, the funds were deposited into the equivalent of a digital interest-bearing savings account. The interest Kash users earned came from converting the dollars into UST and staking them in the Anchor Protocol. Other similar Wallet App services that used UST and the Anchor Protocol to earn interest on UST investments included Alice, Celsius Network, Kado, and Hodlnaut. They functioned as user-friendly interfaces that made it easy for everyday investors to access decentralized finance, or "DeFi," opportunities without deep technical knowledge.

33.     Wallet Apps using the Anchor Protocol proved extremely popular. The Celsius Network had approximately 600,000 accounts invested in the Anchor Protocol; 17,000 Hodlanaut users had UST staked in the Anchor Protocol; Kado reported over 8,000 users invested in the Terra ecosystem in some form; and Kash indicated over 2,000 customers used its

product, with 100 percent of its users' holdings invested in UST. Alice was also a large-scale platform with a substantial customer base and significant trading activity in the Anchor Protocol.

34. Traditional banks generally shied away from servicing Wallet Apps because they operated in the largely unregulated world of digital assets. Wallet Apps, therefore, required special banking services. The bank of choice for essentially all Wallet App companies was a Nevada-based trust company called Prime Trust. Rather than avoiding digital assets, Prime Trust focused its business on this market—especially stablecoins. As of 2021, Prime Trust served as a trustee for approximately 30 stablecoins traded in U.S. markets. In the years leading up to 2022, Prime Trust established agreements with several Wallet Apps, including the Wallet Apps used by the Plaintiffs and the Class Members, whereby Prime Trust agreed to provide custody and account services for investors' UST transactions.

35. When a Wallet App user wished to deposit funds into their digital wallet, it was Prime Trust that linked to the user's bank account, withdrew the funds, and held the funds in trust. When a Wallet App user wished to withdraw funds from their wallet, it was again Prime Trust that processed the request and deposited the funds in the user's bank account. Prime Trust's general role was to facilitate the transfer of funds for UST transactions and serve as a custodian of the U.S. dollars and UST involved in those transactions.

36. As of May 2022, several thousand Wallet App users' UST holdings, totaling tens of millions of U.S. dollars, were held in Prime Trust custody accounts.

37. It was unknown at the time, and was in fact a closely held secret, that the counterparty to Wallet App investors' UST transactions was a single liquidity provider: Jump.[1] In this capacity, Jump was serving as the lone liquidity provider and market maker for UST. Thus, all Wallet App investor transactions for UST were routed from the Wallet Apps to Prime

---

[1] In sworn discovery responses described below, Prime Trust identified the entity that was serving as its UST liquidity provider as "Jump Trading." Notably, Jump held its UST in Prime Trust accounts in the name of Jump Crypto subsidiary Tai Mo Shan. The signatory on the account written agreements was a Jump Trading employee, Director Tak Fujishima.

Trust, then from Prime Trust to Jump before the Wallet Apps could stake the UST in the Anchor Protocol.

**How Investors Bought and Staked UST in the Anchor Protocol**



① Investors place orders on Wallet App to "buy" UST

② Wallet App deposits investors' $ into Prime Trust

③ Prime Trust routs orders to Jump, deposits $ into its account

④ Jump approves transaction, issues UST to Prime Trust

⑤ Prime Trust confirms UST transactions to Wallet App

⑥ Wallet App stakes investors' UST in Anchor Protocol

**Jump's Early Partnership with Terraform Labs as a Liquidity Provider**

38.     Jump was an early backer of the Anchor Protocol. Beginning in November 2019, approximately seven months after Luna's April 2019 launch on the Terra blockchain, Terraform entered multiple agreements with Jump[2] whereby Jump would receive Luna from Terraform in exchange for liquidity provider services. These services included acting as a conduit for the transfer of Luna and UST to the investing public, acquiring tokens when they were made available by Terraform, then immediately re-selling them on U.S.-based cryptocurrency asset trading platforms.

---

[2] The parties to the November 2019 written agreements were Terraform and Tai Mo Shan. As detailed below, the written agreements were held out as being between Terraform and Jump Trading. They were signed by Matthew Hinerfeld, who simultaneously served as general counsel for Jump Trading, Jump Crypto, and Tai Mo Shan.

39.     Rather than receiving a fee for its services, Jump obtained loans of Luna tokens, generally for a duration of two years, after which time Jump had the option of returning the Luna to Terraform at no cost or purchasing the loaned tokens at the price specified in the agreements.

40.     Do Kwon described the agreements in an email to Terraform capital investors on January 13, 2020. The subject title of the email was "[CONFIDENTIAL] regarding liquidity partnership" (original bracket insertion). In the email, he stated:

> I am circulating an email among Terra's leading investor group to notify you of an important arrangement we've entered into with Jump Trading…
>
> [W]e've agreed to enter a partnership with Jump Trading whereby:
>
> • Jump will deploy its own resources to improve the liquidity of Terra[3] and Luna
>
> • Jump will deploy a validator and participate in on-chain governance
>
> • Jump is rewarded with call options for Luna at above current Market prices (30, 40, 50 cents) over the next three years to align incentives to improve markets

The email further stated that the agreement with Jump was to remain confidential "at Jump's request," and asked that any questions be sent directly to Do Kwon via an encrypted messaging app.

41.     Jump intended to liquidate its holdings of UST and Luna by transferring them to the investing public and adding to the circulating liquid supply of UST and Luna tokens. By increasing the circulation of these tokens among the investing public, Jump intended to increase the value of Luna, of which it held a significant amount.

**The Jump/Terraform Labs Partnership Deepens in 2020**

42.     In August and September 2020, Jump Crypto President Kanav Kariya, Jump Trading Director Tak Fujishima, and Terraform co-founders Do Kwon and CJ Han held multiple meetings and exchanged multiple correspondence with an objective, as Kariya put it, to "propel Terra to the top of the stablecoin pyramid."

---

[3] "Terra" in this context refers to TerraUSD, the full asset name of UST.

43.     After a week of communication, Kariya emailed Kwon on August 26, 2020, referring to a "partnership" reached between the two sides and a "gentlemen's agreement" whereby "[Jump] will support trading on terra stable coin pairs on all the exchanges we're connected to and help maintain the peg." In exchange, Terraform would loan Jump several million Luna with the option to purchase them at a later date at a deep discount.

44.     Days later, on September 7, 2020, the two sides entered a Loan Confirmation agreement. The named entity representing Jump was, again, Tai Mo Shan and the agreement was signed by Fujishima.

### Jump and Terraform Collude to Artificially Support UST from Losing Its $1 Peg

45.     In late May 2021, the price of UST began to fall below its pegged value of $1.

46.     Both Jump and Terraform saw the de-peg as a threat to the market's confidence in UST and in the Anchor Protocol more generally. Jump was particularly concerned that the value of Luna would be negatively affected. To stave off a collapse, the two companies entered emergency negotiations to artificially restore UST to its peg.

47.     Through a series of agreements that resulted from these emergency negotiations, Jump offered to secretly support the value of UST in exchange for Terraform making concessions on the options contracts the two entities entered in the two prior years.

48.     In a verbal agreement entered on May 23, 2021, Jump[4] agreed to purchase large quantities of UST to prop up its value. In total, Jump agreed to purchase approximately $20 million worth of UST. In exchange, Terraform agreed to fully vest the remaining portion of Luna it owed to Jump from the 2019 agreements. Investors saw Jump's purchases of UST as signs of an increase in demand for UST and its price rose back to $1. Keeping the arrangement secret allowed Terraform to hold out to the investing public that its algorithmic price mechanisms were working to stabilize UST.

---

[4] No specific Jump entity, i.e. Jump Trading, Jump Crypto, or Tai Mo Shan, was identified as the counterparty in this verbal agreement, reinforcing the fact that all of these entities were acting as a single enterprise with a unity of interests.

49.     On May 24, 2021, one day after Jump rescued UST, Jump Trading's owner and co-founder Bill Disomma sent a message on Slack briefing the strategy behind the rescue to four Jump Trading executives: Director of Strategic Initiatives David Heatly, President and Chief Investment Officer Dave Olsen, Chief Operating Officer Matt Schrecengost, and Jump Trading's other owner and co-founder Paul Gurinas.

### Jump's 2021 Agreement to Provide UST Liquidity Services

50.     Jump and Terraform continued negotiations after the May 2021 de-peg that led to Jump playing an even greater role in UST's liquidity.

51.     A June 30, 2021 correspondence between Do Kwon and Kanav Kariya described an arrangement wherein Jump would provide the U.S.-dollar liquidity necessary to fund UST redemptions by Wallet-App investors, including Plaintiffs and the Class, by maintaining and authorizing debits from Prime Trust accounts in Jump's name or under its control. Do Kwon described it as the "PrimeTrust UST liquidity provision." The correspondence stated Terraform would loan Jump "UST inventory in 30-50M clips." Jump would "deposit this UST in PrimeTrust," and "when users buy UST from PrimeTrust, PT credits [Jump's] account with USD and withdraws UST to send to users."

> 2/ PrimeTrust UST liquidity provision
>
> We are in the closing phases of launching a fiat enabled savings SDK for Anchor with PrimeTrust (see Compound's competing product launch announcement here: https://twitter.com/compoundfinance/status/1409590399794962435).
>
> To be able to launch this, we need a third party market maker to keep UST in PrimeTrust's account to be able to satisfy user orders. (See flow of funds here)  The reason we are not able to do this ourselves is because given we are the "issuer" of UST, it could seem as though we are offering unlicensed money transmitter services in the United States.
>
> The lift we would need from you is simple -
> 1) TFL will lend you UST inventory in 30-50M clips
> 2) You deposit this UST in PrimeTrust - when users buy UST from PrimeTrust, PT credits your account with USD and withdraws UST to send to users.
> 3) When the balance falls below 10M UST, we repeat 1 and 2 - we come up with a reasonable schedule for you send us UST sale proceeds in 1 in USDC.
>
> We do not have any other trading firms with which we have enough incentive alignment to trust with large balances of funds, so it is mission critical for Anchor for Jump to be able to fill this role. We will work with you such that the lift / work needed from jump's side is minimal.

52.     After Kwon's June 30, 2021 email, he and Kariya continued to communicate regarding the UST liquidity provision. But rather than communicate by email, which would leave a traceable history of their dialogue, their communications moved to the encrypted messaging apps Signal and Telegram, both end-to-end encryption apps that allow users to delete communications, keeping them secret and untraceable.[5]

53.     Jump and Terraform confirmed, either in verbal or written communications, that Jump would provide the market making and liquidity provision services described in Kwon's June 30, 2021 email. Terraform did, in fact, provide a UST loan and deposited it in Prime Trust accounts, just as described in the UST liquidity provision described in Kwon's June 30, 2021 email.

54.     The stated purpose of the UST liquidity provision arrangement was "to satisfy user orders." The "user orders" described in this correspondence were orders placed by Wallet App users, such as Plaintiffs and the Class, whose UST buy and sell orders routed from their Wallet Apps to Prime Trust, and from there to Jump.

55.     These agreements were further intended to, and did, make Jump the lone liquidity provider and market maker for UST, such that when Wallet App users redeemed UST for dollars, Prime Trust required Jump's cooperation and authorization to access U.S.-dollar funds held in accounts Jump controlled.

56.     In return for Jump's UST liquidity services, Terraform agreed to remove contingencies restraining Jump's right to exercise the options on Luna from its prior agreements and enabled Jump to immediately profit from its relationship with Terraform. A July 21, 2021 writing memorialized the Luna vesting arrangement.[6] The agreement granted Jump the right to

---

[5] Kwon and Kariya were both a part of five group chats on Signal, including one titled "Jump <> Terra," and had been exchanging messages on the app since at least February 2021. Kariya stated in one such message that the reason for using Signal was "[C]ompliance feels much mor [sic.] comfortable here with the disappearing chats," and stated "[w]e've been strongly pushed to move all our conversations here."

[6] Again, Tai Mo Shan was the party named in the written agreement. It was signed by Jump Trading Director, Tak Fujishima.

acquire up to 61.5 million Luna from Terraform at a fixed strike price of $0.40 per token at a time when its value was approximately $9.00 per token (its value rose to over $100 per token in December 2021). Jump ultimately profited by more than $73 million from the sale of these Luna tokens.

**Jump's Obligations as UST's Lone Liquidity Provider and Market Maker**

57.     Jump was the lone liquidity provider and market maker for Wallet App users who invested in UST. Late in the day on May 23, 2021, after Jump had rescued UST, two members of the Terraform communications team exchanged messages on Slack debriefing on the near collapse and planning a response. One asked, "What market makers do we use besides Jump?" The other responded, "That's the only one I nkow [sic.]." Prime Trust further confirmed that "Jump Trading" was the only UST liquidity provider servicing Wallet App investors in its public blog posts, letters to state regulators, and sworn interrogatory responses.

58.     As UST's lone liquidity provider and market maker for Wallet App users, Jump was obligated to: (i) continuously quote two-sided prices and honor trades at those quotes (market-maker function); (ii) provide actual executable liquidity for investor buy and sell orders routed via Prime Trust, and (iii) treat investor orders that matched its quotes as binding trades, not as offers it can freely ignore.

59.     The fact that Jump was the only liquidity provider and market maker for Wallet App users heightened the users' reliance on Jump and meant that their sell orders were more than just "withdrawing from the market." Functionally, it meant that a refusal by Jump would violate the very service Terraform bargained for: a standing counterpart through which users could turn UST into cash.

60.     Jump's obligations as the lone liquidity provider and market maker for Wallet App users investing in UST were explicitly described in the written UST liquidity provision, Kwon's June 30, 2021 email, were further described in the subsequent verbal or written communication in encrypted messaging apps, and were further demonstrated by Jump's performance (at least temporarily) of its obligations. Jump not only called itself a liquidity provider and market maker, it actually received inventory from Terraform, held that inventory in

15

a Prime Trust deposit account, quoted prices, and filled investor buy and sell orders, just as described in the written communications between Terraform and Jump. Its performance history strengthens the inference that the "liquidity provider" and "market maker" labels were not aspirational, they were a business undertaking to stand in as the counterparty for investors using Wallet Apps.

**The May 2022 Collapse and Jump's Refusal to Provide Liquidity**

61.     By early May 2022, UST's total supply exceeded 18 billion tokens, with a market capitalization over $18.5 billion, and Luna's market capitalization exceeded $26 billion, much of the ecosystem's growth stemming from Jump's prior intervention and continued public promotion of UST's stability.

62.     On May 9, 2022, UST again began to lose its $1 peg, and over the next several days its price fell precipitously, dropping below $0.90 and then continuing downwards as investors attempted to exit their positions.

63.     During this period, Wallet App users, including Plaintiffs and Class Members, submitted redemption orders through their Wallet Apps to sell UST and receive U.S. dollars back into their bank accounts. Those orders were routed to Prime Trust, which required Jump's cooperation as UST's liquidity provider to fund and authorize the redemptions.

64.     By posting a bid, Jump represented it was willing to buy UST at its quoted price. Jump recognized the investor sell orders but refused to settle, breaching its express agreement to be a "liquidity provider" and "market maker" for that flow.

65.     Jump's refusal to fund and authorize redemption orders effectively shut down the Wallet App users' redemption channel and left them unable to retrieve their dollars as UST's price collapsed.

66.     Jump's refusal to provide liquidity occurred even as it held, or had just received, massive benefits from its relationship with Terraform, including (a) more than $1.28 billion in profits from the sale of discounted Luna acquired under their option agreements and (b) 52,189 Bitcoin that the Terraform-related Luna Foundation Guard transferred to Jump as purported peg-defense reserves.

16

**Jump Denied Investor Orders to Sell UST**



① Investors place orders on Wallet App to "sell" UST as price falters

② Wallet App routes "sell" orders to Prime Trust

③ Prime Trust notifies Jump of "sell" order

④ Jump refuses to fill investors' sell orders, keeps investors' $ and goes dark

67. As a direct and foreseeable result of Defendants' refusal to provide liquidity, Plaintiffs and the Class suffered catastrophic losses, losing as much as 90 percent of their invested principal and, in many cases, tens or hundreds of thousands of dollars each.

68. A former Jump employee speaking to Forbes on the condition of anonymity was quoted as saying "the history of finance was written in the blood of investors."

### Defendants' Concealment and Delayed Discovery

69. Jump intentionally withheld its central role in defending UST's peg in May 2021. Accordingly, it kept its role as UST's primary liquidity provider strictly secret into the future, including at the time Plaintiffs attempted to redeem their UST in May 2022.

70. Regulatory filings in 2023 regarding the collapse of the Terra ecosystem described Jump's role as UST's liquidity provider but identified Jump only as an unnamed "U.S. trading firm" or "Firm-1."

71. It was not until December 28, 2023, when the court presiding over the SEC's enforcement action against Terraform Labs and Do Kwon issued a written decision on summary judgment, that Defendants were officially and publicly identified as "Firm-1" and their central role in the May 2021 and May 2022 events was confirmed.

72. Plaintiffs acted diligently under the circumstances and could not, in the exercise of reasonable diligence, have discovered Defendants' identity and role in the events giving rise

to their claims until those public disclosures and related materials became available on December 28, 2023.

## CLASS ALLEGATIONS

73.     Plaintiffs bring this class action to seek relief on behalf of themselves and the following Class ("the Class"):

> All persons who, on or before May 9, 2022, held TerraUSD ("UST") through one or more Wallet Apps whose UST-to-U.S.-dollar redemption orders were routed to Prime Trust, and who (a) submitted one or more requests on May 9 or 10, 2022 to redeem UST for U.S. dollars and (b) were unable to have those redemption requests filled in whole or in part.

74.     Plaintiffs reserve the right to amend the Class definition if discovery or further investigation demonstrate that it should be expanded or otherwise modified.

75.     The members of the Class are so numerous, counting at least 10,000 investors, that joinder of all members would be impracticable.

76.     There are questions of law and fact common to the members of the Class that predominate over any questions affecting only individual members, including:

a.  Whether Defendants breached contractual duties arising from agreements entered into with Terraform Labs, Prime Trust, or other entities;

b.  Whether the Class Members were third-party beneficiaries of the contracts Defendants breached;

c.  Whether Defendants stole, took away, converted, or appropriated the Class's property;

d.  Whether Defendants' conduct was a substantial cause of the Class's losses and harm; and

e.  The nature and quantity of damages suffered by members of the Class.

77.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs have no interests antagonistic to those of the Class and are not subject to any unique defenses.

78.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained attorneys experienced in class action and complex litigation.

79. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons:

   a. It is economically impractical for members of the Class to prosecute individual actions;

   b. The Class is readily ascertainable and definable;

   c. Prosecution as a class action will eliminate the possibility of repetitious litigation; and

   d. A class action will enable claims to be handled in an orderly and expeditious manner, will save time and expense, and will ensure uniformity of decisions.

80. Plaintiffs do not anticipate any difficulty in the management of this litigation.

## CAUSES OF ACTION

### Count I – Breach of Contract (third-party beneficiary)

81. Plaintiffs reallege and incorporate by reference all allegations herein.

82. Jump entered into agreements, both written and verbal, with Terraform Labs, Prime Trust, and related entities (the "Subject Contracts") under which Jump agreed to provide UST liquidity and market-making services, including (i) to maintain continuous two-sided quotations and execute trades at those quoted prices in its role as market maker; (ii) to supply genuine, executable liquidity for investor buy and sell orders routed through Prime Trust; and (iii) to treat investor orders that matched its quotes as binding transactions rather than discretionary offers it could decline.

83. These obligations arose from the agreements' express "liquidity provider" and "market maker" language, the operational structure involving Wallet Apps and Prime Trust that routed all user flow to Jump, and Jump's course of performance.

84. The Subject Contracts included, among other instruments, written loan and option agreements granting Jump deeply discounted rights to acquire Luna in exchange for providing liquidity and peg-defense services, subsequent written amendments eliminating vesting conditions in exchange for Jump's agreement to defend UST's peg, and written and verbal arrangements, including the UST liquidity provision agreements entered on or around June 30,

2021, with Terraform Labs and other intermediaries to provide liquidity provider and market maker services.

85.     The Subject Contracts were expressly intended to, and did, benefit UST investors, including Plaintiffs and the Class, who used Wallet Apps and Prime Trust–linked rails to buy, hold, and redeem UST, by ensuring that those investors could obtain U.S. dollars back when they submitted redemption orders. Plaintiffs and the Class were intended third-party beneficiaries of the Subject Contracts because the primary purpose and effect of those contracts was to provide them with liquidity and protection against a run on UST, and Jump knew or reasonably should have known that UST investors would rely on the terms of the Subject Contracts and seek to enforce them if Jump failed to provide liquidity or meet its market making obligations.

86.     Jump breached the Subject Contracts by refusing to fund and authorize the execution of Plaintiffs' and Class Members' UST redemption orders in May 2022, including on May 9–10, 2022, even though Jump was obligated to do so under its liquidity-provision and market-making undertakings.

87.     As a direct and proximate result of Jump's breaches, Plaintiffs and the Class were unable to redeem their UST for dollars and suffered severe financial losses as UST's price collapsed. But for Jump's refusal to execute at the price it itself quoted, Plaintiffs and the Class would have exited at that price and avoided the full losses they incurred.

88.     Plaintiffs and the Class are entitled to recover damages in an amount to be proven at trial, together with pre- and post-judgment interest and all other relief the Court deems just and proper.

89.     This claim is timely under 735 ILCS 5/13-206 because it arises from written contracts. In the alternative, to the extent any obligations arose under non-written agreements, this claim is timely under 735 ILCS 5/13-205, as tolled by the discovery rule and Jump's fraudulent concealment of its role.

### Count II – Conversion

90.     Plaintiffs reallege and incorporate by reference all allegations herein.

20

91.     Plaintiffs and the Class had a right to immediate possession of specific, identifiable funds—U.S.-dollar funds held or controlled by Jump in Prime Trust or related accounts—that existed to satisfy UST redemptions by Wallet App users and were earmarked for that purpose.

92.     Jump wrongfully exercised dominion and control over Plaintiffs' and the Class's property by refusing to honor the very liquidity function it had undertaken to provide. Pursuant to its agreements with Terraform, Jump received UST inventory, deposited that inventory with Prime Trust, quoted prices to the investing public, and served as the market maker and liquidity provider through which investors could purchase and sell UST. When UST began to lose value, Plaintiffs and the Class sought to sell their UST at prices Jump quoted or otherwise controlled, but Jump refused to execute those sales. By controlling the only available mechanism through which Plaintiffs and the Class could convert their UST back into cash and then refusing to do so, Jump assumed unauthorized dominion over Plaintiffs' and the Class's funds in derogation of their rights.

93.     Plaintiffs and the Class had a right to the property at issue and an absolute and unconditional right to immediate possession of the proceeds of their attempted sales. Plaintiffs and the Class had already paid money to acquire UST, and no further condition remained to be satisfied once Plaintiffs elected to sell their UST at Jump's quoted or operative market price. Under the structure Jump established, investor funds and UST flowed through Prime Trust precisely so that investors could enter and exit UST positions using Jump as the exclusive source of executable liquidity. At the moment Plaintiffs and the Class submitted sell orders, they were therefore entitled to immediate possession of the corresponding cash proceeds of those sales, and Jump's refusal interfered directly with that possessory right.

94.     Plaintiffs and the Class made demand for the return of their property and Jump refused that demand. Plaintiffs' and the Class's sell orders, submitted through the only available market-making and liquidity-provision channel, constituted demands that Jump perform its undertaking and return the cash value of Plaintiffs' UST in exchange for the tokens tendered for sale. Rather than honor those orders, Jump declined to execute them, notwithstanding that it had

21

undertaken to act as the market maker and liquidity provider for that market. Jump's refusal to process Plaintiffs' and the Class's sales and remit the corresponding proceeds amounted to a refusal to return their property upon demand.

95. The money at issue is specific and identifiable. Plaintiffs and the Class do not seek recovery of an undifferentiated debt or a mere expectation of payment. They seek recovery of specifically identifiable funds tied to investments in which Jump received corresponding dollar payments when users purchased UST. When Plaintiffs and the Class sought to sell their UST, the proceeds to which they were entitled were tied to a specific, closed system of accounts, inventory, and transaction flows administered through Prime Trust and controlled by Jump as the sole market maker and liquidity provider. Those funds were therefore not general sums owed in the abstract, but specific and identifiable money connected to particular transactions and an identifiable mechanism for payment.

96. By reason of the foregoing, Jump converted Plaintiffs' and the Class's property by wrongfully exercising control over specifically identifiable funds and sale proceeds to which Plaintiffs and the Class had an immediate right of possession and by refusing to return that property when demanded.

97. As a direct and proximate result of Jump's conduct, Plaintiffs and the Class were deprived of the value of their UST and suffered damages. Plaintiffs and the Class are entitled to recover all damages and other appropriate relief for Jump's conversion in an amount to be proven at trial.

98. This claim is timely under 735 ILCS 5/13-205, which provides a five-year limitations period for conversion, including under the discovery rule given Jump's concealment.

### Count III – Unjust Enrichment (in the alternative)

99. Plaintiffs reallege and incorporate by reference all allegations herein.

100. By virtue of the Terraform/Jump arrangement, Jump received and retained substantial monetary and other economic benefits directly traceable to Plaintiffs' and the Class's investments in UST. Terraform loaned UST inventory to Jump for the express purpose of enabling Jump to act as the exclusive market maker and liquidity provider for UST, and when

22

Plaintiffs and the Class purchased UST, Prime Trust credited Jump's accounts with U.S. dollars (or dollar-equivalents) funded by Plaintiffs and the Class. Jump further benefited from trading spreads, fees, and other trading profits associated with filling investor buy orders and maintaining UST liquidity, all of which were made possible only because Plaintiffs and the Class committed their capital to UST within the system Jump agreed to support.

101.    Jump's retention of these benefits was to Plaintiffs' and the Class's detriment. Plaintiffs and the Class paid money to acquire UST in reliance on the existence of functioning liquidity and a market-making infrastructure that would allow them to sell their UST and recover value, including when market conditions deteriorated. When UST began to de-peg and Plaintiffs and the Class attempted to sell their UST at prices Jump quoted or was capable of supporting, Jump refused to execute those sales or otherwise provide an avenue for Plaintiffs and the Class to exit their positions. As a result, Plaintiffs and the Class were left holding UST that rapidly declined in value to zero, while Jump retained the benefits it had already received from Plaintiffs' and the Class's initial purchases and prior UST-related trading activity.

102.    Jump's retention of these benefits is unjust and inequitable under the circumstances. Jump voluntarily undertook to serve as the market maker and liquidity provider for UST, accepted valuable consideration and trading-related benefits derived from Plaintiffs' and the Class's participation in that ecosystem, and then refused to perform the core liquidity function on which Plaintiffs' and the Class's investments depended at the very moment it was most needed. Having positioned itself as the exclusive source of executable liquidity and profited from that position, Jump cannot, consistent with principles of justice, equity, and good conscience, retain the benefits derived from Plaintiffs' and the Class's funds while disclaiming responsibility for providing the very liquidity that induced them to commit those funds.

103.    Accordingly, Jump has been unjustly enriched at Plaintiffs' and the Class's expense, and equity requires restitution and disgorgement of the benefits Jump obtained from their UST-related transactions. Plaintiffs and the Class seek, inter alia, restitution in the amount of the money and other pecuniary benefits conferred upon Jump that are attributable to Plaintiffs'

23

and the Class's investments in UST, together with such additional equitable relief as the Court deems just and proper to prevent Jump from retaining the fruits of its unjust enrichment.

104. This claim is timely under 735 ILCS 5/13-205, which provides a five-year limitations period for quasi-contract and unjust-enrichment claims, subject to tolling under the discovery rule.

**Count IV – Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2) ("IFCA")**

105. Plaintiffs reallege and incorporate by reference all allegations herein.

106. Plaintiffs and the Class are "persons" within the meaning of 815 ILCS 505/1(c), and Defendants are "persons" within the meaning of 815 ILCS 505/1(c) who engaged in trade or commerce within the meaning of 815 ILCS 505/1(f).

107. 815 ILCS 505/2 prohibits unfair methods of competition and unfair practices in the conduct of trade or commerce. Under Illinois law, a practice is unfair if it offends public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers. All three criteria need not be present.

108. Jump's refusal to fulfill its market maker obligations when execution would result in losses to itself, while Plaintiffs and the Class were left trapped in a collapsing investment, satisfies all three prongs. It offends public policy favoring market reliability and fair dealing as market makers serve a critical liquidity function. It is unethical and oppressive to accept the benefits of serving as a market maker while abandoning investors at the moment they most need liquidity. It caused substantial injury to Plaintiffs and the Class who lost nearly 100 percent of their investment value.

109. Defendants engaged in unfair and deceptive acts and practices in trade or commerce, including but not limited to:

    a. Misrepresenting the nature and stability of UST and the Terra ecosystem;

    b. Concealing Defendants' role in defending the 2021 peg and the true basis of UST's apparent stability; and

24

c. Failing to disclose Defendants' conflicts of interest and self-dealing in receiving discounted Luna while promoting UST to consumers.

110. Jump's conduct conferred no countervailing benefit to consumers, competition, or the public that could justify or outweigh the harm it caused. Jump's misrepresentations and omissions regarding the availability of UST liquidity, and its refusal to provide the market-making and liquidity services it had undertaken to perform, did not enhance market efficiency, reduce costs, promote transparency, or otherwise advance any legitimate business or consumer interest. Instead, Jump's conduct served only to protect its own trading position and profits while leaving Plaintiffs and the Class trapped in a collapsing asset with no meaningful ability to exit. In these circumstances, there is no countervailing benefit sufficient to offset the substantial injury inflicted on Plaintiffs and the Class.

111. Defendants' unfair and deceptive acts and practices occurred primarily and substantially in Illinois, where Defendants are headquartered and where many of the decisions, communications, and promotions at issue emanated.

112. As a direct and proximate result of Defendants' violations of the ICFA, Plaintiffs and the Class suffered actual damages, including the loss of their UST investments and related harm. Plaintiffs and the Class further seek all available relief under ICFA, including punitive damages, attorneys' fees, and costs.

113. This claim is timely under 815 ILCS 505/10a(e), subject to tolling based on the discovery rule and fraudulent-concealment doctrine, because Plaintiffs could not reasonably discover Defendants' role in the misconduct until late 2023 and thereafter acted diligently.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court:

a)  Certify this action as a class action under Rule 23 and appoint Plaintiffs as class representatives and their counsel as class counsel;

b)  Enter judgment in favor of Plaintiffs and the Class and against Defendants on all counts;

c)  Award compensatory, restitutionary, and punitive damages as allowed by law;

d)  Order disgorgement of Defendants' ill-gotten gains;

e)  Award attorneys' fees and costs; and

f)  Grant such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED

Dated this 7th of May 2026.

ERICKSON KRAMER OSBORNE LLP

*/s/ Elizabeth A. Kramer*

Julie C. Erickson
Elizabeth A. Kramer
Kevin M. Osborne

Julie Erickson, *pro hac vice* forthcoming (julie@eko.law)
Elizabeth Kramer, admitted *pro hac vice* (elizabeth@eko.law)
Kevin Osborne, *pro hac vice* forthcoming (kevin@eko.law)
**Erickson Kramer Osborne LLP**
959 Natoma Street
San Francisco, CA 94103
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiffs AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD*

26