**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

AUSTIN WARD, DAVID KREVAT, and NABIL MOHAMAD, individually and on behalf of others similarly situated,

Plaintiffs,

v.

JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS LLC, and TAI MO SHAN LIMITED,

Defendants.

Case No. 1:26-cv-05346

Honorable Elaine E. Bucklo

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS LLC, AND TAI MO SHAN LIMITED'S MOTIONS TO DISMISS AND TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .......... **1**

**RELEVANT BACKGROUND** .......... **4**

I. The Terra Ecosystem and the UST Stablecoin .......... 4

II. Plaintiffs' Class Action Suits .......... 5

III. The "Subject Contracts" That Plaintiffs Seek To Enforce .......... 7

**ARGUMENT** .......... **10**

I. Plaintiffs' Facially Deficient Claims Must Be Dismissed .......... 10

A. Plaintiffs Fail To State a Third-Party Beneficiary Breach of Contract Claim (Count I) .......... 11

1. Plaintiffs' Attempt To Enforce Multiple "Subject Contracts" Against "Jump" Fails to Provide Sufficient Notice Of Their Claims Under Rule 8(a) .......... 12

a. Plaintiffs' Group Pleading Is Improper .......... 12

b. Plaintiffs' Vague Allegations of the "Subject Contracts" Also Fail To Provide Notice of the Jump Entities' Purported Breaches .......... 16

2. Plaintiffs Lack Third-Party Beneficiary Standing To Enforce the "Subject Contracts" .......... 17

3. Plaintiffs Do Not Plausibly Allege the Contractual Obligation Purportedly Breached By the Jump Entities .......... 22

a. Plaintiffs Fail To Plead the Existence of a Valid and Enforceable Contractual Obligation With Terms That the Jump Entities Purportedly Breached .......... 23

b. Plaintiffs' Factual Allegations Undermine Their Implausible Theory That the Jump Entities Contractually Agreed To Redeem the UST Held By Investors During the Terra Ecosystem Collapse .......... 26

B. Plaintiffs Fail To State a Claim for Violation of the Illinois Consumer Fraud and Deceptive Practices Act (Count IV) .......... 30

1. The ICFA Claim Is Untimely .......... 30

2. Plaintiffs Do Not Allege a Sufficient Connection to Illinois .......... 33

3. Plaintiffs' ICFA Claim Is Insufficiently Pleaded .......... 34

C. Plaintiffs' Remaining State Law Claims Must Be Dismissed ........................................ 37

1. Plaintiffs Fail To State a Claim for Conversion (Count II) ........................................ 37

2. Plaintiffs Fail To State a Claim for Unjust Enrichment (Count III) ............................ 40

II. If This Court Were To Find That Plaintiffs Properly Pleaded That They Are Third-Party Beneficiaries of the "Subject Contacts," Then Their Claims Are Subject To Arbitration ........................................................................................................ 41

A. The Contract At Issue Requires Arbitration ................................................................ 42

B. Plaintiffs Are Estopped From Avoiding Arbitration ..................................................... 43

1. Federal Common Law Supplies the Equitable Estoppel Test .................................... 43

2. Plaintiffs' Own Allegations Require Arbitration of Their Claims .............................. 44

C. Plaintiffs' Claims Fall Squarely Within the Scope of the 2019 Loan Agreement's Broad Arbitration Clause ........................................................................................ 47

D. If the Court Compels Arbitration of Only Some Claims, Any Remaining Claims Should Be Stayed ........................................................................................................ 48

**CONCLUSION ........................................................................................................ 50**

**TABLE OF AUTHORITIES**

*Acad. Chicago Publishers v. Cheever*,
578 N.E.2d 981 (Ill. 1991) .......... 23

*ACW Flex Pack LLC v. Wrobel*,
2023 WL 4762596 (N.D. Ill. July 26, 2023) .......... 37, 38

*AIT Worldwide Logistics, Inc. v. Pac. Coast Container, Inc.*,
2024 WL 4041323 (N.D. Ill. Sept. 4, 2024) .......... 38

*Aleshire v. Harris, N.A.*,
2009 WL 10701866 (N.D. Ill. Oct. 27, 2009) .......... 24

*Am. Cas. Co. of Reading, Pennsylvania v. Schilli Transp. Servs., Inc.*,
2009 WL 10722244 (N.D. Ind. Feb. 12, 2009) .......... 49

*Am. Fam. Mut. Ins. Co. v. Krop*,
120 N.E.3d 982 (Ill. 2018) .......... 31

*Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*,
860 F.3d 489 (7th Cir. 2017) .......... 5

*Anderson Elec. v. Ledbetter Erection Corp.*,
503 N.E.2d 246 (Ill. 1986) .......... 37

*Anderson v. Ctrs. for New Horizons, Inc.*,
891 F. Supp. 2d 956 (N.D. Ill. 2012) .......... 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 10

*Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*,
493 F.3d 841 (7th Cir. 2007) .......... 23, 24, 25

*Avery v. State Farm Mut. Auto. Ins. Co.*,
835 N.E.2d 801 (Ill. 2005) .......... 33

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013) .......... 11, 12

*Beach v. Citigroup Alternative Invs. LLC*,
2014 WL 904650 (S.D.N.Y. Mar. 7, 2014) .......... 15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 25

*Bogie v. Rosenberg*,
705 F.3d 603 (7th Cir. 2013) ........ 26

*Braman v. Woodfield Gardens Assocs., Realcorp Invs. I*,
715 F. Supp. 226 (N.D. Ill. 1989) ........ 38

*Bridge v. New Holland Logansport, Inc.*,
815 F.3d 356 (7th Cir. 2016) ........ 13

*Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*,
547 F.3d 882 (7th Cir. 2008) ........ 23

*Camargo v. Abbvie, Inc.*,
2026 WL 115068 (N.D. Ill. Jan. 14, 2026) ........ 33, 34

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
761 F.3d 732 (7th Cir. 2014) ........ 34

*Campbell v. Freedom Mortg. Corp.*,
2023 WL 1345652 (N.D. Ill. Jan. 31, 2023) ........ 30, 31

*Carson Pirie Scott & Co. v. Parrett*,
178 N.E. 498 (Ill. 1931) ........ 18, 19

*Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*,
500 F.3d 571 (7th Cir. 2007) ........ 43

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) ........ 41

*Cohen v. Am. Sec. Ins. Co.*,
735 F.3d 601 (7th Cir. 2013) ........ 40, 41

*Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*,
250 F.3d 570 (7th Cir. 2001) ........ 34

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009) ........ 33

*Darne v. Ford Motor Co.*,
2017 WL 3836586 (N.D. Ill. Sep. 1, 2017) ........ 35

*De Bouse v. Bayer*,
922 N.E.2d 309 (Ill. 2009) ........ 36

*Derse, Inc. v. Haas Outdoors, Inc.*,
2009 WL 2228736 (E.D. Wis. July 21, 2009) ........ 49

*Digisound-WIE, Inc. v. BeStar Techs., Inc.*,
2008 WL 11517597 (N.D. Ill. May 30, 2008) .......... 49

*EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*,
2008 WL 4057745 (Del. Ch. Sept. 2, 2008) .......... 16

*ED Cap., LLC v. Bloomfield Inv. Res. Corp.*,
757 F. App'x 26 (2d Cir. 2018) .......... 11

*ED Cap., LLC v. Bloomfield Inv. Res. Corp.*,
2018 WL 1779379 (S.D.N.Y. Apr. 3, 2018) .......... 11

*Elsasser v. DV Trading, LLC*,
444 F. Supp. 3d 916 (N.D. Ill. 2020) .......... 46

*Ennenga v. Starns*,
677 F.3d 766 (7th Cir. 2012) .......... 31

*F.W. Hempel & Co. v. Metal World, Inc.*,
721 F.2d 610 (7th Cir. 1983) .......... 18, 19, 22

*Fireman's Fund Am. Ins. Cos. v. Burns Elec. Sec. Servs., Inc.*,
417 N.E.2d 131 (Ill. App. Ct. 1980) .......... 38

*Fosnight v. Jones*,
41 F.4th 916 (7th Cir. 2022) .......... 15

*Gersten v. Intrinsic Techs., LLP*,
442 F. Supp. 2d 573 (N.D. Ill. 2006) .......... 44

*Glob. Gaming Phil., LLC v. Razon*,
2022 WL 836716 (S.D.N.Y. Mar. 21, 2022) .......... 14

*Glob. Tech. & Trading, Inc. v. Satyam Comput. Servs. Ltd.*,
2011 WL 308162 (N.D. Ill. Jan. 28, 2011) .......... 26

*Glob. Tech. & Trading, Inc.*,
2009 WL 4788693 (N.D. Ill. Dec. 09, 2009) .......... 41

*Gociman v. Loyola Univ. of Chi.*,
41 F.4th 873 (7th Cir. 2022) .......... 41

*Goldfarb v. Bautista Concrete, Inc.*,
126 N.E.3d 516 (Ill. App. Ct. 2019) .......... 19

*Grabianski v. Bally Total Fitness Holding Corp.*,
891 F. Supp. 2d 1036 (N.D. Ill. 2012) .......... 10, 20

*Gray v. Dane Cnty.*,
854 F.2d 179 (7th Cir. 1988) .................................................................................. 10

*Guarantee Trust Life Ins. Co. v. Kribbs*,
68 N.E.3d 1046 (Ill. App. Ct. 2016) ......................................................................... 31

*Halloran v. Dickerson,*
679 N.E.2d 774 (Ill. App. Ct. 1997) ......................................................................... 23

*Harbor Drive Condo. Ass'n v. Harbor Point, Inc.*,
568 N.E.2d 365 (Ill. App. Ct. 1991) ................................................................... 18, 19

*Harrison v. Soroof Int'l, Inc.*,
320 F. Supp. 3d 602 (D. Del. 2018)........................................................................... 15

*Haught v. Motorola Mobility, Inc.*,
2012 WL 3643831 (N.D. Ill. Aug. 23, 2012) ...................................................... 33, 34

*Highsmith v. Chrysler Credit Corp.*,
18 F.3d 434 (7th Cir. 1994) ...................................................................................... 30

*Hirschbach Motor Lines, Inc. v. Navistar, Inc.*,
2026 WL 879715 (N.D. Ill. Mar. 30, 2026)............................................................... 17

*Holmes v. Marion Cnty. Sheriff's Off.*,
141 F.4th 818 (7th Cir. 2025) ...................................................................................... 5

*Hoopla Sports & Ent., Inc. v. Nike, Inc.*,
947 F. Supp. 347 (N.D. Ill. 1996).............................................................................. 25

*Horan v. Ford Motor Co.*,
2026 WL 395630 (N.D. Ill. Feb. 12, 2026) ................................................................ 35

*Horbach v. Kaczmarek*,
288 F.3d 969 (7th Cir. 2002) ................................................................................ 39, 40

*Hostforweb Inc. v. Cloud Equity Grp. SIM LLC*,
2019 WL 6033648 (N.D. Ill. Nov. 14, 2019) ............................................................. 46

*Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.*,
659 F.2d 836 (7th Cir. 1981) ................................................................................ 44, 47

*In re Stillwater Asset Backed Offshore Fund Ltd.*,
559 B.R. 563 (Bankr. S.D.N.Y. 2016)........................................................................ 14

*In re Thebus*,
483 N.E.2d 1258 (Ill. 1985)........................................................................................ 39

*Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S., Inc.*,
2007 WL 951943 (N.D. Ill. Mar. 27, 2007) ........ 42, 44, 46

*Jackson Nat'l Life Ins. Co. v. Gofen & Glossberg, Inc.*,
882 F. Supp. 713 (N.D. Ill. 1995) ........ 19, 20, 22

*Jain v. de Méré,*
51 F.3d 686 (7th Cir. 1995) ........ 43

*Kahn v. Walmart, Inc.*,
107 F.4th 585 (7th Cir. 2024) ........ 34

*Karpowicz v. Gen. Motors Corp.*,
1997 WL 285943 (N.D. Ill. May 23, 1997) ........ 32

*Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*,
174 F.3d 907 (7th Cir. 1999) ........ 47

*Larue v. Mills*,
2019 WL 3195140 (N.D. Ill. July 15, 2019) ........ 22

*Leff v. Deutsche Bank AG*,
2009 WL 1380819 (N.D. Ill. May 14, 2009) ........ 46

*Lefkovitz v. Wagner*,
1998 WL 312001 (N.D. Ill. June 4, 1998) ........ 43, 47, 48

*Mach. Tool Tech. 21, Inc. v. United Grinding Techs., Inc.*,
2003 WL 1524646 (N.D. Ill. Mar. 21, 2003) ........ 26

*Maroon Soc'y v. Unison Consulting Inc.*,
2020 WL 5076688 (N.D. Ill. Aug. 26, 2020) ........ 37

*Masters v. Lowe's Home Ctrs., Inc.*,
2009 WL 1657925 (S.D. Ill. June 11, 2009) ........ 46

*MD Spine Sols., LLC v. UnitedHealth Grp., Inc.*,
2022 WL 124160 (N.D. Ill. Jan. 13, 2022) ........ 37, 39

*Meadoworks, LLC v. Linear Mold & Eng'g, LLC*,
2020 WL 5365977 (N.D. Ill. Sept. 8, 2020) ........ 37

*Menard, Inc. v. U.S. Equities Dev., Inc.*,
2002 WL 314571 (N.D. Ill. Feb. 28, 2002) ........ 20, 22

*Mengers v. Gulf Stream Coach Inc.*,
136 F. Supp. 3d 1006 (N.D. Ind. 2015) ........ 46

*Northbound Group, Inc. v. Norvax, Inc.*,
795 F.3d. 647 (7th Cir. 2015) ........ 13

*Outokumpu Stainless USA, LLC v. Coverteam SAS*,
2022 WL 2643936 (11th Cir. July 8, 2022) ........ 43

*Patterson 357, LLC v. Heidelberg Materials Midwest Agg, Inc.*,
2024 WL 1301331 (N.D. Ill. Mar. 27, 2024) ........ 48

*Payton v. Cnty. of Carroll*,
473 F.3d 845 (7th Cir. 2007) ........ 39

*Payton v. Cnty. of Kane*,
301 F. Supp. 2d 835 (N.D. Ill. 2004) ........ 39

*Perdue v. Hy-Vee, Inc.*,
455 F. Supp. 3d 749 (C.D. Ill. 2020) ........ 16, 17

*PXP Producing Co. LLC v. MitEnergy Upstream LLC*,
342 A.3d 402 (Del. Ch. 2025) ........ 14

*Quinn v. McGraw–Hill Companies, Inc.*,
168 F.3d 331 (7th Cir. 1999) ........ 18, 19, 20, 22

*Rohlfing v. Manor Care, Inc.*,
172 F.R.D. 330 (N.D. Ill. 1997) ........ 33, 34

*Scheurer v. Fromm Fam. Foods LLC*,
863 F.3d 748 (7th Cir. 2017) ........ 44

*Scheurer v. Fromm Fam. Foods LLC*,
202 F. Supp. 3d 1040 (W.D. Wis. 2016) ........ 44

*Schwebe v. AGC Flat Glass N. Am., Inc.*,
2013 WL 2151551 (N.D. Ill. May 16, 2013) ........ 34

*Setty v. Shrinivas Sugandhalaya LLP*,
3 F.4th 1166 (9th Cir. 2021) ........ 43

*Shapiro v. Residential Homes for Rent, LLC*,
2023 WL 3436401 n.2 (N.D. Ill. May 12, 2023) ........ 42

*Sharma v. Rhino Holdings Aurora, LLC*,
2025 WL 327779 (N.D. Ill. Jan. 29, 2025) ........ 40

*Stewart v. JP Morgan Chase Bank, N.A.*,
2022 WL 294763 n.4 (N.D. Ill. Feb. 1, 2022) ........ 36

*Streams Club, Ltd. v. Thompson*,
536 N.E.2d 459 (Ill. App. Ct. 1989) ........ 46

*Swiss Reinsurance Am. Corp. v. Access Gen. Agency, Inc.*,
571 F. Supp. 2d 882 (N.D. Ill. 2008) ........ 12

*Tartan Constr., LLC v. New Equip. Servs. Corp.*,
2018 WL 4563079 (N.D. Ill. Sept. 24, 2018) ........ 31

*Tate v. Beverly Chrysler Plymouth*,
538 N.E.2d 663 (Ill. App. Ct. 1989) ........ 31, 32

*Theriot v. Captain James Sprinkle, Inc.*,
30 F.3d 136 (7th Cir. 1994) ........ 30

*Trittipo v. O'Brien*,
561 N.E.2d 1201 (Ill. App. Ct. 1990) ........ 25

*United Lab'ys, Inc. v. Savaiano*,
2007 WL 4162808 (N.D. Ill. Nov. 19, 2007) ........ 22

*Valley Air Serv. v. Southaire, Inc.*,
2009 WL 1033556 (N.D. Ill. Apr. 16, 2009) ........ 22

*Vilter Mfg. Co. v. Loring*,
136 F.2d 466 (7th Cir. 1943) ........ 22

*Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*,
474 F.3d 966 (7th Cir. 2007) ........ 48

*W. Bend Mut. Ins. Co. v. Schumacher*,
844 F.3d 670 (7th Cir. 2016) ........ 10

*Waterford Condo. Ass'n v. Dunbar Corp.*,
432 N.E.2d 1009 (Ill. App. Ct. 1982) ........ 19

*Welborn Clinic v. MedQuist, Inc.*,
301 F.3d 634 (7th Cir. 2002) ........ 48

*West v. Act II Jewelry, LLC*,
2016 WL 1073095 (N.D. Ill. Mar. 18, 2016) ........ 14

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
536 F.3d 663 (7th Cir. 2008) ........ 35

*XL Disposal Corp. v. John Sexton Contractors Co.*,
659 N.E.2d 1312 (Ill. 1995) ........ 18

*Yash Venture Holdings, LLC v. Moca Fin., Inc.*,
116 F.4th 651 (7th Cir. 2024) .......... 23, 24

**Statutes**

9 U.S.C. § 202 .......... 43

815 ILCS 505 .......... 30

## PRELIMINARY STATEMENT

This class action lawsuit rests on a contractual obligation that appears in no contract. Plaintiffs, who concede they are strangers to the only real agreements at issue, have identified neither a contractual provision that Defendants supposedly breached, nor any provision granting them third-party beneficiary status to sue under any agreement at all. The written contracts that do exist contradict Plaintiffs' allegations outright. And even if Plaintiffs could overcome that obstacle and somehow plead a viable third-party beneficiary breach of contract claim, those same contracts nevertheless mandate that Plaintiffs' claims be resolved in arbitration, not before this Court. Having first attempted to bring their suit in the Northern District of California last year based on the same imaginary contractual obligation they sue on here, Plaintiffs have had ample opportunity to cure these pleading defects. They have not, because they cannot.

Plaintiffs bring this class action on behalf of a subset of holders of the TerraUSD crypto asset ("UST") to recover losses that they allegedly suffered from the breach of a dreamed-up contract during the collapse of the Terraform cryptocurrency ecosystem ("Terra Ecosystem") of which UST was a part. In June 2024, a jury in the SEC's trial against the creator of the Terra Ecosystem, Terraform Labs Pte. Ltd. ("TFL") and its founder Do Kwon, found TFL and Kwon liable for a multi-billion-dollar fraud. Yet Plaintiffs, pursuant to a breach of contract theory, now seek to shift responsibility for their losses to "Jump"—their collective term for the three distinct defendants they have sued: Jump Trading, LLC ("Jump Trading"), Jump Crypto Holdings LLC ("Jump Crypto"), and Tai Mo Shan Limited ("TMSL") (together, the "Jump Entities").

Plaintiffs' central allegation is that they and other UST holders were "locked in their investments with no counter party" for their UST sell orders while the Terra Ecosystem entered a "death spiral." Instead of blaming TFL or Kwon, who have already been found liable for the Terra

Ecosystem's collapse but who may be judgment proof at this point, Plaintiffs assert that the Jump Entities were contractually obligated to buy whatever amount of UST Plaintiffs and any similarly situated person decided they wanted to sell during the market event—a commitment that, by Plaintiffs' own allegations, would require "Jump" to buy "*tens of millions*" (and potentially *billions*) of dollars' worth of UST just as it was becoming worthless. This extraordinary allegation is based on an imagined contractual obligation supposedly found somewhere in a vague and ever-shifting set of alleged agreements with TFL and other entities.

No such contractual obligation exists, and the real contracts that do exist and that Plaintiffs cite in their Complaint in no way support their outlandish allegations. The plain language of those contracts dooms Plaintiffs' case: they contain express provisions disclaiming any intent to benefit third parties, and they do not contain any language even remotely suggesting they were made for the purpose of providing Plaintiffs (or anyone else) a guaranteed buyer at any time, let alone during a market collapse. Further, those agreements require arbitration of Plaintiffs' claims if Plaintiffs actually have third-party beneficiary status to assert them. Plaintiffs' theory thus is fatally defective several times over and should be dismissed for the following reasons.

*First*, Plaintiffs' third-party beneficiary breach of contract claim fails on numerous independent grounds. Replete with group pleading and grossly vague allegations, Plaintiffs' breach of contract claim fails to provide the Jump Entities sufficient notice, as they seek to hold "Jump" liable for the purported breach of an amorphous constellation of agreements with various counterparties (named and unnamed) that they group together as the "Subject Contracts." By referring to the agreements collectively, Plaintiffs studiously avoid describing the terms of any single contract. This is fatal to their claim, because they do not allege: (i) the specific provisions demonstrating Plaintiffs' third-party beneficiary standing; (ii) the existence of a valid and

enforceable contractual obligation with terms purportedly breached by any entity; or (iii) which entity allegedly breached which amorphous alleged contract. Moreover, the provisions in the agreements that do exist and are allegedly a part of the "Subject Contracts" directly contradict Plaintiffs' alleged theory of liability.

*Second*, presumably recognizing that no court will permit them to proceed on bare assertions of fictional contractual obligations, Plaintiffs feebly try to bring a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") by adding to their contract-based allegations only conclusory assertions that the Jump Entities engaged in deceptive acts. But as is apparent from the face of the Complaint, Plaintiffs' ICFA claim is untimely, lacks the requisite nexus to Illinois, and is not pleaded with the particularity Rule 9(b) requires.

*Third*, Plaintiffs' remaining state-law claims fare no better. With their conversion claim, Plaintiffs seek the money that they wish they had received were they able to sell their UST, but the economic loss doctrine bars Plaintiffs' effort to refashion their meritless contract claim as a tort, and they otherwise fail to sufficiently plead key elements for conversion. Plaintiffs' unjust enrichment claim likewise fails because they cannot pursue that claim on an alternative basis while simultaneously basing it on allegations of express contracts or those underlying their defective ICFA claim.

*Fourth*, even if Plaintiffs had properly pleaded their claims (and they did not), this Court is not the proper forum for resolving them. To the extent that Plaintiffs plead their claims based on contracts that do exist, those agreements all contain broad mandatory arbitration clauses covering this dispute. Thus, were the Court to find that Plaintiffs sufficiently alleged they are third-party beneficiaries of the agreements, the Court should compel arbitration.

## RELEVANT BACKGROUND[1]

### I. The Terra Ecosystem and the UST Stablecoin

Plaintiffs Austin Ward, David Krevat, and Nabil Mohamad held UST, a cryptocurrency that was among a "suite of algorithmic stablecoins" that TFL developed and issued. Compl. ¶¶ 9–11, 23–24. As an "algorithmic" stablecoin, UST was "designed to maintain" its value or "peg" at $1 through an "algorithmic relationship" with LUNA, another cryptocurrency. *Id.* ¶ 24.

UST's "algorithmic mechanism" was a system of arbitrage incentives for market participants to trade when UST's price deviated from $1. *Id.* When UST's price dropped below $1, market participants could buy UST and exchange it for $1 worth of LUNA, and profit from the difference; when UST's price rose above $1, market participants could swap $1 worth of LUNA for one UST to sell above $1, and profit from the difference. *Id.* These exchanges, if made, would reduce the supply of UST when the price dropped below $1 and increase its supply when the price exceeded $1—effectively disciplining the market price of UST toward $1. *Id.*

TFL's "flagship product" was the Anchor Protocol, which was "designed to function on the Terra blockchain like a high-yield savings account" for "retail and institutional investors" to earn interest on deposits of their UST or to borrow UST and pay interest on the loan. *Id.* ¶¶ 25, 26. The success of that product "depended on an inflow of UST depositors and funds." *Id.* ¶ 28. To bolster its ecosystem, TFL sought to increase the availability of LUNA and UST to the investing public. *Id.* ¶ 38. In late 2019 and 2020, TMSL entered into agreements with TFL under

[1] Although many of the Complaint's allegations are demonstrably false, its well-pleaded factual allegations are accepted as true only for purposes of the Jump Entities' arguments for dismissal of the Complaint.

which TMSL obtained loans of LUNA to trade on U.S.-based cryptocurrency asset trading platforms. *Id.* ¶¶ 38–44.[2]

In May 2021, UST materially deviated downward from its peg. *Id.* ¶¶ 45, 46. The Jump Entities purchased UST with the expectation that the price would rise back to its $1 peg. *Id.* ¶ 48. UST did eventually repeg, *id.*, and it did not depeg again until May 2022, *id.* ¶ 62. On May 9, 2022, UST's price lost its $1 peg, which "triggered a death spiral" causing the price to fall below $0.90 "as investors attempted to exit their positions." *Id.* ¶¶ 2, 62. Ultimately, the Terra Ecosystem collapsed, which became the subject of regulatory investigations. *Id.* ¶ 70. The SEC sued TFL and Kwon, *id.* ¶ 71, and a jury found them liable for intentionally and recklessly defrauding purchasers of UST and LUNA, among other civil offenses, *see* Ex. A, Compl., *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346 (S.D.N.Y. Feb. 16, 2023), Dkt. No. 1; Ex. B, Verdict, *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346 (S.D.N.Y. Apr. 5, 2024), Dkt. No. 229.[3] TFL filed for bankruptcy in January 2024. Ex. C, Ch. 11 Pet., *In re Terraform Labs Pte. Ltd.*, No. 1:24-bk-10070 (Bankr. D. Del. Jan. 21, 2024), Dkt. No. 1.

## II. Plaintiffs' Class Action Suits

Plaintiffs—residents of California, Florida, and Washington—seek to represent a nationwide class of certain UST holders for claims arising out of their failed efforts to "redeem

[2] Plaintiffs allege that these agreements were made by "Terraform," which they define as Terraform Labs Pte. Ltd. Compl. ¶ 1. These agreements, which are attached as Exs. 1 to 4, to the Declaration of Matthew Hinerfeld ("Hinerfeld Declaration") filed herewith, were, in fact, entered into by two different Terraform entities: Terraform Labs Pte. Ltd. and Terraform Labs Limited. As explained *infra* p. 9, fn. 4, these agreements are properly considered on a motion to dismiss as they are central to Plaintiffs' claims. All references to numbered exhibits are to those attached to the Hinerfeld Declaration.

[3] All references to lettered exhibits are to those attached to the Declaration of Jonathan D. Cogan ("Cogan Declaration") filed herewith. The Court may consider "information that is properly subject to judicial notice" when ruling on a motion to dismiss, such as the court filings cited herein. *See Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017) (cleaned up); *Holmes v. Marion Cnty. Sheriff's Off.*, 141 F.4th 818, 822 (7th Cir. 2025).

UST for U.S. dollars" during the market collapse. Compl. ¶ 73. Plaintiffs and the putative class accessed UST through digital "Wallet Apps"—applications that allow users to "store, send, receive, and exchange digital assets"—none of which any Jump Entity is alleged to have controlled. *Id.* ¶¶ 29, 32–34. Wallet Apps invested the funds deposited by their users into "yield-bearing digital asset investments," including UST staked in the Anchor Protocol. *Id.* ¶¶ 30, 31. The bank used by these Wallet Apps—Prime Trust (a Nevada-based trust company)—agreed with the Wallet Apps to "provide custody and account services for investors' UST transactions." *Id.* ¶¶ 34–35.

In December 2022, less than a year after the market collapse, Plaintiffs filed a class action against Prime Trust, which remains pending in the U.S. District Court for the District of Nevada. Ex. D, Compl., *Ward v. Prime Trust, LLC*, No. 2:22-cv-02034 (D. Nev. Dec. 7, 2022), Dkt. No. 1-2. Prime Trust filed for Chapter 11 bankruptcy in August 2023, and, since then, that action has been stayed. Ex. E, Docket, *Ward v. Prime Trust, LLC*, No. 2:22-cv-02034 (D. Nev.).

Years later, unable to recover from two bankrupted entities (TFL and Prime Trust), Plaintiffs set their sights on the Jump Entities. Plaintiffs first sued Jump Trading and Jump Crypto in the Northern District of California, even though the California court did not have jurisdiction over them; the court dismissed the suit on that basis. Ex. F, Compl., *Ward v. Jump Trading, LLC*, No. 3:25-cv-03989 (N.D. Cal. May 7, 2025), Dkt. No. 1 ("N.D. Cal. Compl."); *see also* Order, *Ward v. Jump Trading, LLC*, No. 3:25-cv-03989 (N.D. Cal. Jan. 20, 2026), Dkt. No. 74.

On May 8, 2026, Plaintiffs filed their Complaint in this District. As in California, Plaintiffs bring a third-party beneficiary breach of contract claim based on a theory that the Jump Entities breached a contractual obligation found in a group of agreements that would have guaranteed that Plaintiffs (and others) could liquidate their UST holdings with the Jump Entities at any time,

including during a market collapse. Compl. ¶¶ 81–86. Plaintiffs also pursue claims for conversion, unjust enrichment, and violation of ICFA. *Id.* ¶¶ 81–113. While Plaintiffs in California alleged that their action concerned only the allegations that "Jump breached contractual obligations to serve as a liquidity provider and fill investors' orders to sell," Plaintiffs now attempt to allege market manipulation and deceptive conduct for their ICFA claim. Ex. F, N.D. Cal. Compl. ¶ 10 & n.1; Compl. ¶ 109.

## III. The "Subject Contracts" That Plaintiffs Seek To Enforce

Plaintiffs assert that they are third-party beneficiaries of a group of "Subject Contracts" that were both written and oral and between or among "Jump" and "Terraform Labs, Prime Trust, and related entities." Compl. ¶ 82. Plaintiffs allege that under this group of agreements, "Jump" agreed to "provide UST liquidity and market-making services." *Id.*; *see also id.* ¶ 2. But Plaintiffs do not identify in any agreement the specific terms of any such "UST liquidity and market-making" obligation requiring the Jump Entities to purchase all UST that Plaintiffs or anyone else sought to sell so that they were not left "locked in their investments with no counter party to fill [their] orders" during the Terra Ecosystem collapse. *Id.* ¶ 3. Rather, in a single count, Plaintiffs plead that "Jump," collectively, breached the Subject Contracts "by refusing to fund and authorize the execution" of Plaintiffs' and other UST holders' "redemption orders," claiming that the Subject Contracts were somehow made to "provide [Plaintiffs and the entire putative class] with liquidity and protection against a run on UST." *Id.* ¶¶ 81–86.

Plaintiffs define the Subject Contracts as "includ[ing], among other instruments": "written loan and option agreements granting Jump deeply discounted rights to acquire Luna in exchange for providing liquidity and peg-defense services"; "subsequent written amendments eliminating vesting conditions in exchange for Jump's agreement to defend UST's peg"; and "written and verbal arrangements, including the UST liquidity provision agreements entered on or around June

30, 2021, with [TFL] and other intermediaries to provide liquidity provider and market maker services." *Id.* ¶¶ 82, 84. Of this laundry list of purported arrangements, Plaintiffs allege specific identifying details at least with respect to the "written loan and option agreements" and "subsequent written amendments" with TFL, which are publicly available from the SEC's suit against TFL. *Id.* ¶ 82.

Specifically, Plaintiffs allege that, "[b]eginning in November 2019," Compl. ¶ 38, the Jump Entities allegedly received from TFL "discounted rights to acquire Luna in exchange for providing liquidity and peg-defense services" through a set of loan and option contracts, *id.* ¶ 84; *see also id.* ¶ 38 (alleging that "Terraform entered multiple agreements with Jump whereby Jump would receive Luna from Terraform in exchange for liquidity provider services"); *id.* ¶ 39 ("Jump obtained loans of Luna tokens, generally for a duration of two years, after which time Jump had the option of returning the Luna to Terraform at no cost or purchasing the loaned tokens at the price specified in the agreements."). Plaintiffs base those allegations on a master digital currency loan agreement from November 2019 (the "2019 Loan Agreement") between TMSL and TFL. *See id.* ¶ 38 & n.2; Ex. 1 (2019 Loan Agreement). However, the 2019 Loan Agreement expressly disclaims any third-party beneficiary rights, providing that it is "***solely for the benefit of the parties hereto*** and their respective successors and assigns, and ***no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement***." *Id.* § XVIII (emphases added); *see also id.* at Ex. A (Loan Term Sheet providing that the "agreement incorporates all of the terms" of the 2019 Loan Agreement). That contract also contains a mandatory arbitration clause requiring "arbitration in the Cayman Islands" of "dispute[s] aris[ing] out of or relat[ing] to this Agreement." *Id.* § IX.

The Complaint also mentions two loan confirmations (the "September 2020 Loan Confirmation" and "July 2021 Loan Confirmation") that were entered by TMSL pursuant to a master loan agreement from 2020 ("2020 Master Loan Agreement," and together with the 2019 Loan Agreement, the "Loan Agreements"). Compl. ¶ 44 (alleging that "on September 7, 2020, the two sides entered a Loan Confirmation agreement. The named entity representing Jump was, again, Tai Mo Shan and the agreement was signed by Fujishima."); *id.* ¶ 56 & n.6 (TMSL was "the party named in the written agreement," "[a] July 21, 2021 writing" that "memorialized the Luna vesting arrangement.").[4] Like the 2019 Loan Agreement, the 2020 Master Loan Agreement disclaims any third-party beneficiary rights and contains a mandatory arbitration clause. Ex. 2 § XVI ("Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Confirmation hereunder, shall create any rights in favor of or impose any obligation upon any Person other than the Parties and their respective successors and permitted assigns.");[5] *id.* § XI (requiring arbitration under the AAA Commercial Arbitration Rules "[i]f a dispute arises out of or relates to this Agreement, or the breach thereof").

Plaintiffs did not attach any of the written Subject Contracts to their Complaint despite having them.[6] While in the California action Plaintiffs denied that the "written loan and option

---

[4] Copies of the 2020 Master Loan Agreement, the September 2020 Loan Confirmation and the July 2021 Loan Confirmation are attached to the Hinerfeld Declaration as Exhibits 2, 3, and 4, respectively. Plaintiffs rely on the Loan Agreements in the Complaint and include them as part of the Subject Contracts that were allegedly breached by the Jump Entities. As such, those agreements are central to Plaintiffs' claims and are properly considered on a motion to dismiss. *See, e.g.*, *Anderson v. Ctrs. for New Horizons, Inc.*, 891 F. Supp. 2d 956, 959 (N.D. Ill. 2012) (Bucklo, J.).

[5] This provision, expressly precluding third-party rights, is incorporated into the subsequent loan confirmations in September 2020 and July 2021 to which Plaintiffs refer in the Complaint. *See* Ex. 3 (September 2020 Loan Confirmation) at 1 ("The terms of this Loan are specified below and in the Master Loan Agreement."); Ex. 4 (July 2021 Loan Confirmation) at 1 ("The terms of this Loan are specified below and in the Master Loan Agreement.").

[6] These agreements with TFL entities are publicly available from the trial record in the SEC's suit against TFL and were also provided to Plaintiffs in connection with Jump Trading and Jump Crypto's motion to

agreements" and "subsequent written amendments" with TFL were among the Subject Contracts that they sought to enforce,[7] Plaintiffs have now reversed course and affirmatively plead specific identifying details regarding them.

## ARGUMENT

### I. Plaintiffs' Facially Deficient Claims Must Be Dismissed

The Complaint must be dismissed under Rule 12(b)(6) for failure to "state a claim to relief that is plausible on its face." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). Although, when "ruling on motions to dismiss, courts must presume that all facts fairly alleged in the complaint are true," they are "not obliged . . . to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law." *Gray v. Dane Cnty.*, 854 F.2d 179, 182 (7th Cir. 1988). Here, Plaintiffs fail to make "direct or inferential allegations to establish the necessary elements" for any claim to survive a motion to dismiss. *Grabianski v. Bally Total Fitness Holding Corp.*, 891 F. Supp. 2d 1036, 1046 (N.D. Ill. 2012) (Bucklo, J.) (quotations and citation omitted). Further, the Complaint's entirely group-pleaded allegations warrant dismissal

dismiss and to compel arbitration and their motion for Rule 11 sanctions filed in the California action. *See* Mot. Dismiss and Compel Arb. Br. at 5–6, 30–31, *Ward v. Jump Trading LLC*, 3:25-cv-03989 (N.D. Cal. July 9, 2025), Dkt. No. 32; *see also* Decl. of Jonathan Cogan ISO Rule 11 Mot., *Ward v. Jump Trading LLC*, No. 3:25-cv-03989 (N.D. Cal. Sept. 26, 2025), Dkt. No. 51. In addition to the Loan Agreements, Plaintiffs also obtained from the Jump Entities in the now-dismissed California action copies of TMSL's August 2021 agreements with Prime Trust. *See* Mot. Dismiss and Compel Arb. Br. at 5–6, 30–31. But Plaintiffs tellingly do not identify the counterparties, dates, or other detail from those contracts, despite alleging that the Subject Contracts include agreements with Prime Trust. Compl. ¶ 82 ("Jump entered into agreements . . . with . . . *Prime Trust*."). These agreements also contain provisions that are inconsistent with Plaintiffs' allegations. *See infra* pp. 21–22, 29–30. As the Court may consider the Prime Trust agreements sufficiently referenced in the Complaint, they are also submitted with the Jump Entities' motions. Ex. 5 (Account Agreement); Ex. 6 (OTC Trading Agreement).

[7] *See* Mot. Dismiss and Compel Arb. Opp. Br. at 35, *Ward v. Jump Trading LLC*, 3:25-cv-03989 (N.D. Cal. Sept. 8, 2025), Dkt. No. 46 ("In truth, the complaint does not make *any* reference to them all, either by name or as to their content."); *id.* at 36 (representing that the agreements "cannot" be the "agreements referenced" in the complaint).

of the Complaint for failure to provide fair notice of the claims under Rule 8(a). *See Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (under federal notice-pleading standard, a "complaint based on a theory of collective responsibility must be dismissed").

### A. Plaintiffs Fail To State a Third-Party Beneficiary Breach of Contract Claim (Count I)

In an attempt to plead some factual allegations in their Complaint, Plaintiffs point to counterparties of written agreements made by TMSL, but none of those agreements require any Jump Entity to be a buyer of last resort for UST. Nor do they convey third-party beneficiary rights. It is therefore unsurprising that Plaintiffs' attempt to allege a third-party beneficiary breach of contract claim fails for numerous independent reasons. First, the breach of contract claim does not meet Rule 8(a)'s notice-pleading standard because the allegations rely on improper group pleading and seek to hold the Jump Entities collectively liable for the purported breach of an ill-defined group of agreements. Second, Plaintiffs fail to allege any contractual terms sufficient to plead that they have standing to enforce any agreement as third-party beneficiaries; in fact, the agreements that are referenced in the Complaint expressly disclaim that they confer any third-party beneficiary rights. Third, Plaintiffs do not (and cannot) plausibly allege the existence of any valid and enforceable contractual obligation requiring the Jump Entities (or any one of them) to purchase UST from every putative class member even during a market collapse.[8]

[8] Plaintiffs allege that Illinois law applies to their third-party beneficiary breach of contract claim based on the ill-defined group of "Subject Contracts" they claim the Jump Entities entered. Compl. ¶¶ 5, 82. The Jump Entities therefore apply Illinois law for purposes of their motion to dismiss this claim only. As explained *supra*, however, the "Subject Contracts" are defined to include the Loan Agreements between TFL entities and TMSL, which have choice-of-law provisions requiring the application of Cayman law and Illinois law. Ex. 1 (2019 Loan Agreement) § IX (Cayman law); Ex. 2 (2020 Master Loan Agreement) § XI (Illinois law). Even if the Court were to apply Cayman law, Plaintiffs' breach of contract claim must fail, as Cayman law likewise forecloses Plaintiffs' effort to sue as third-party beneficiaries. Cayman law requires an agreement to "explicitly confer a third-party beneficiary the right to enforce that contract." *ED Cap., LLC v. Bloomfield Inv. Res. Corp.*, 2018 WL 1779379, at *7 n.5 (S.D.N.Y. Apr. 3, 2018), *aff'd*, 757 F. App'x 26 (2d Cir. 2018) (citing Cayman Islands Statute titled "The Contracts (Rights of Third parties)").

### 1. Plaintiffs' Attempt To Enforce Multiple "Subject Contracts" Against "Jump" Fails to Provide Sufficient Notice Of Their Claims Under Rule 8(a)

Plaintiffs purport to bring in just one substantive count a breach of contract claim against three distinct legal entities for the alleged breach of obligations "ar[ising] from" a confusing combination of sources—multiple vaguely described agreements with various parties, "the operational structure involving the Wallet Apps," and "Jump's course of performance." Compl. ¶¶ 82–84. That claim must be dismissed because Plaintiffs' improper group pleading fails to give the Jump Entities fair notice of the grounds on which they are being sued. *See Swiss Reinsurance Am. Corp. v. Access Gen. Agency, Inc.*, 571 F. Supp. 2d 882, 885 (N.D. Ill. 2008) (Bucklo, J.) (granting motion to dismiss breach of contract claims that alleged in "just two substantive counts . . . breaches of four different agreements . . . by three ostensibly separate corporate entities").

#### a. Plaintiffs' Group Pleading Is Improper

Plaintiffs' claims are replete with group pleading of the three Jump Entities as "Jump" and thus fail to allege conduct by any specific Jump Entity. Compl. ¶¶ 81–113 (all counts in the Complaint refer to the Jump Entities collectively). This deficiency alone requires dismissal of the Complaint for failure to provide fair notice of the claims under Rule 8(a). *See Bank of Am., N.A.*, 725 F.3d at 818. These group-pleaded allegations are especially problematic with respect to their breach of contract claim, as Plaintiffs "fail[] to state clearly which entity [they] seek[] to hold responsible for which alleged breach." *Swiss Reinsurance Am. Corp.*, 571 F. Supp. 2d at 885.

Plaintiffs generally allege that "Jump" "entered into agreements" and that "Jump" somehow collectively "breached the Subject Contracts." Compl. ¶¶ 82, 86. But, by Plaintiffs' own allegations, each of the Jump Entities was not a party to each of the Subject Contracts, and it is black-letter Illinois law that those who are not parties to an agreement cannot ordinarily be held

liable for its breach. *See, e.g.*, *Northbound Group, Inc. v. Norvax, Inc.*, 795 F.3d. 647, 650 (7th Cir. 2015) (applying Illinois law). Specifically, Plaintiffs concede that certain of the Subject Contracts include agreements that were made by TMSL only (and not the other Jump Entities), yet they nevertheless seek to hold all Jump Entities liable for breaching them. *See* Compl. ¶¶ 38 & n.2; *id.* ¶ 44; *id.* ¶¶ 56 & n.6; *id.* ¶ 84 ("The Subject Contracts included, among other instruments, written loan and option agreements granting Jump deeply discounted rights to acquire Luna in exchange for providing liquidity and peg-defense services . . . .").[9] As to the other Subject Contracts, Plaintiffs do not specify which of the three Jump Entities are the alleged parties.

Plaintiffs' alter-ego allegations do not cure this defect. Compl. ¶¶ 12–17. Plaintiffs assert that each of the Jump Entities "conducted business relevant" to the matter "through various alter ego entities," including each other. *Id.* ¶¶ 12–14. But even were Plaintiffs' conclusory alter-ego allegations supported by factual detail (they are not), they do not allege the exacting conditions required for veil-piercing under the applicable law—here, Delaware for Jump Trading and Jump Crypto, and Cayman Islands for TMSL, *id*. ¶¶ 12–14.[10]

In Delaware, veil-piercing is permitted only when the entity "exist[s] for no other purpose than as a vehicle for fraud" and not piercing the veil would result in "an overall element of injustice or unfairness"—the pleading of which is a "difficult task." *PXP Producing Co. LLC v. MitEnergy*

[9] For example, as to one of the Subject Contracts purportedly breached by "Jump," Plaintiffs allege in conclusory fashion that it was entered into by TMSL "representing Jump" (whatever that means); as to another of TMSL's agreements that they seek to enforce against "Jump," they assert the agreement was "held out as being" made by Jump Trading, but they do not explain how, why, by whom, or to whom. *See* Compl. ¶ 44; *id.* ¶ 38 & n.2. Plaintiffs also allege that certain of TMSL's agreements with TFL were signed by a "Jump Trading Director, Tak Fujishima." *Id.* ¶ 56 n.6; *see also id.* ¶ 42 (alleging that Tak Fujishima is a "Jump Trading Director"). But the signature block in that agreement does not refer to Fujishima as a "Jump Trading" director; rather, it simply denotes "Director" and is shown under the "Tai Mo Shan Limited" entity name. Ex. 4 (July 2021 Loan Confirmation).

[10] Under the internal affairs doctrine, the law of the place of incorporation governs the corporate veil-piercing analysis. *See Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 364 (7th Cir. 2016).

*Upstream LLC*, 342 A.3d 402, 416–17 & n.86 (Del. Ch. 2025) ("Veil piercing is a tough thing to plead and a tougher thing to get."). Various factors are considered in determining whether the entity exists to serve as a "vehicle for fraud," including whether the "company was adequately capitalized," the "company was solvent," and "corporate formalities were observed"—but the "central inquiry is whether a defendant abused or manipulated the corporate form." *Id.* at 417 (quotations omitted). Cayman law is "equally—if not more—stringent than . . . Delaware" law, permitting veil piercing only where a company has been used as a dishonest facade or sham to conceal the true facts or as a device for an illegal or improper purpose. *Glob. Gaming Phil., LLC v. Razon*, 2022 WL 836716, at *7 (S.D.N.Y. Mar. 21, 2022); *see also In re Stillwater Asset Backed Offshore Fund Ltd.*, 559 B.R. 563, 588 (Bankr. S.D.N.Y. 2016) (under Cayman law, "[d]isregarding corporate entities is permitted . . . only in 'exceptional cases' where 'special circumstances' show that the corporate form was a mere façade concealing the true facts" (citation omitted)).

Plaintiffs cannot meet that difficult task. They offer little more than conclusory allegations of "unity of interest and ownership" among the Jump Entities and a bald assertion that TMSL acted as a "mere instrumentality and business conduit" for Jump Trading and Jump Crypto. Compl. ¶ 16. They state, for example, that certain personnel of Jump Trading and Jump Crypto "acted in a dual capacity" for TMSL, that the Jump Entities shared employees, and that TMSL's "separate officers or directors . . . held nominal positions only." *Id.* ¶¶ 16-17. But the sharing of employees does not suggest that TMSL was "merely a sham . . . used to further the interests" of Jump Trading or Jump Crypto. *West v. Act II Jewelry, LLC*, 2016 WL 1073095, at *5 (N.D. Ill. Mar. 18, 2016) (concluding under Delaware law that allegations that an entity's director and executive were also owners of the member entity controlling its operations were insufficient to "rise to the level"

necessary to pierce the "corporate veil" even if funds were mismanaged); *Beach v. Citigroup Alternative Invs. LLC*, 2014 WL 904650, at *7, *10 (S.D.N.Y. Mar. 7, 2014) (under Cayman law, allegations that subsidiaries of parent entity were "advertised as an 'investment department'" of parent, that parent entity appointed subsidiaries' directors, and that parent entity had representatives act as agents for the subsidiaries were found merely "consistent with a traditional relationship between a parent company and a subsidiary" and thus "not sufficient to give rise to an inference that [the parent] abused the corporate form or used it as a facade to conceal its relationship"). Nor does Plaintiffs' naked allegation of co-mingling assets—devoid of any well-pleaded factual allegations that assets were in fact co-mingled—suggest any undercapitalization. Compl. ¶ 16.

Plaintiffs' conclusory assertion that "fraud and injustice would result if these entities were treated separately, as Jump Trading and Jump Crypto would escape liability for the conduct of [TMSL]" also does not come close to alleging the exceptional circumstances necessary to disregard the Jump Entities' separate legal existences. *Id.* ¶ 17. They have failed to meet their burden of pleading specific facts that would justify the extraordinary remedy of piercing the corporate veil.[11] "[A]ny party that brings a legal claim . . . against a purported alter ego company can assert that an injustice is being done to them (e.g., based on the facts that give rise to their claim for breach of contract, or their tort claim) . . . ." *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 619 (D. Del. 2018) (quotations omitted). "[T]hat is not the kind of injustice that is relevant." *Id.* Rather, "the requisite element of fraud under the alter ego theory must come from

[11] In fact, publicly available information heavily contradicts Plaintiffs' alter-ego allegations. For example, as an SEC-regulated broker-dealer, Jump Trading publicly files audited annual reports, which the Court may take judicial notice of as a "matter[] of public record" from a "source[] whose accuracy cannot reasonably be questioned." *See Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022). These reports reflect Jump Trading's adequate capital and observation of corporate formalities. *See* Jump Trading, LLC Filings, Securities and Exchange Commission, https://www.sec.gov/edgar/browse/?CIK=0001127998.

an inequitable use of the corporate form itself as a sham, and not from the underlying claim." *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008).

In sum, Plaintiffs' group pleading precludes their breach of contract claim.

**b. Plaintiffs' Vague Allegations of the "Subject Contracts" Also Fail To Provide Notice of the Jump Entities' Purported Breaches**

Plaintiffs' breach of contract count also fails to provide sufficient notice of the agreements assertedly breached. Plaintiffs base their breach of contract claim on an unspecified number of agreements in varying forms—"both written and verbal"—and between or among multiple different counterparties, such as "Jump," "Terraform Labs, Prime Trust, and related entities," and elsewhere, "Terraform Labs and other intermediaries," and yet further elsewhere, "Terraform Labs, Prime Trust, or other entities" entirely unidentified. Compl. ¶¶ 76(a), 82, 84. But "broadly referring to unspecific contracts" with "various entities" is "not sufficient to put Defendant[s] on notice" of a contract claim under Rule 8(a). *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 765 (C.D. Ill. 2020).

According to Plaintiffs, the "Subject Contracts" allegedly include, but are not limited to, various "instruments": (i) "written loan and option agreements granting Jump deeply discounted rights to acquire Luna in exchange for providing liquidity and peg-defense services"; (ii) "subsequent written amendments eliminating vesting conditions in exchange for Jump's agreement to defend UST's peg"; and (iii) "written and verbal arrangements, including the UST liquidity provision agreements entered on or around June 30, 2021, with [TFL] and other intermediaries to provide liquidity provider and market maker services." Compl. ¶¶ 82, 84. While Plaintiffs allege certain identifying details regarding the Loan Agreements with TFL, their vague references to other "instruments" and "written and verbal arrangements" suggest that Plaintiffs

base their contract claim on various kinds of understandings, including those that they do not even attempt to identify and those that (assuming they even exist) may not be legally binding. *Id.* ¶ 84. What's more, as explained *infra*, Plaintiffs also do not quote or describe the terms of any specific agreement that they contend was breached. Instead, compounding their failure to provide adequate notice, Plaintiffs at times claim that "Jump breached *the Subject Contracts*," *see, e.g.*, *id.* ¶ 86 (emphasis added), and at other times assert that the obligations purportedly breached "*arose*" from not just those agreements, but rather those agreements *together with* "the operational structure" of UST transactions and "Jump's course of performance," *id.* ¶ 83 (emphasis added).

Plaintiffs' allegations, which create only "confusion as to how many contracts exist and between whom" and which of the agreements were assertedly breached and by which entity, precludes any inference that an agreement exists with the contractual obligation Plaintiffs claim was breached. *Hirschbach Motor Lines, Inc. v. Navistar, Inc.*, 2026 WL 879715, at *5 (N.D. Ill. Mar. 30, 2026) (dismissing breach of contract claim as allegations were unclear as to whether the claim was based on "one contract or multiple, or contracts between one plaintiff and multiple defendants"). The claim must therefore be dismissed for failure to provide fair notice. *Perdue*, 455 F. Supp. 3d at 765 (dismissing contract claim based on "extremely broad" allegations because "the contracts Plaintiffs allude[d] to could encompass a wide variety of different terms that are not applicable, or perhaps no such contracts exist").

#### 2. Plaintiffs Lack Third-Party Beneficiary Standing To Enforce the "Subject Contracts"

Plaintiffs concede that they are not parties to the Subject Contracts and seek to enforce them as alleged third-party beneficiaries. *E.g.*, Compl. ¶¶ 81–89. But Plaintiffs do not (and cannot) plead that they are intended third-party beneficiaries with the factual allegations that

Illinois law requires. *Id.* ¶ 5 ("Plaintiffs assert claims under Illinois law for breach of contract as third-party beneficiaries . . . ."). That failure requires dismissal of the claim.

Under Illinois law, there is a "strong presumption that parties to a contract intend that the contract's provisions apply to *only* them and not to third parties." *Quinn v. McGraw–Hill Companies, Inc.*, 168 F.3d 331, 334 (7th Cir. 1999) (quoting *155 Harbor Drive Condo. Ass'n v. Harbor Point, Inc.*, 568 N.E.2d 365, 375 (Ill. App. Ct. 1991) (emphasis in original)); *F.W. Hempel & Co. v. Metal World, Inc.*, 721 F.2d 610, 614 (7th Cir. 1983) (same for oral agreements). To enforce an agreement as a third party, the third party must be a "direct rather than an incidental beneficiary," which requires that the "contracting parties have manifested in their contract an intention to confer a benefit upon the third party." *F.W. Hempel & Co.*, 721 F.2d at 613 (quotations and citation omitted); *accord Quinn*, 168 F.3d at 334 (determining "third-party beneficiary status is a matter of divining whether the contracting parties intended to confer a benefit upon a nonparty to their agreement" (quoting *XL Disposal Corp. v. John Sexton Contractors Co.*, 659 N.E.2d 1312, 1316 (Ill. 1995)). "The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract." *Carson Pirie Scott & Co. v. Parrett*, 178 N.E. 498, 501 (Ill. 1931); *F.W. Hempel & Co.*, 721 F.2d at 613 ("There is no question that the seminal and still vital Illinois authority as to third party beneficiaries is *Carson Pirie Scott & Co.*").

Plaintiffs allege that the "Subject Contracts" "were expressly intended to . . . benefit UST investors" and that they were "*intended third-party beneficiaries* of the Subject Contracts because the *primary purpose and effect of those contracts* was to provide them with liquidity and protection against a run on UST." Compl. ¶ 85 (emphases added). But whether the contracting parties intended to benefit a third party directly must be determined based on the contract's express terms and the circumstances at the time the contract was executed. *F.W. Hempel & Co.*, 721 F.2d at 613

(citing *Carson Pirie Scott & Co*, 178 N.E. at 501). The "best evidence of intent to benefit" is "[e]xpress language in the contract identifying the third-party beneficiary." *Quinn*, 168 F.3d at 334. While an "implied showing" may suffice, the "implication that the contract applies to third parties" must be "so strong as to be practically an express declaration." *Id*. (internal citations and quotations omitted). And this showing must, in any event, be premised on the agreement's terms. *155 Harbor Drive Condo. Ass'n*, 568 N.E.2d at 375 (affirming dismissal of third-party beneficiary claims where no language in agreement constituted a "virtual express declaration" and did not otherwise "express an intent to directly benefit" third parties); *Waterford Condo. Ass'n v. Dunbar Corp.*, 432 N.E.2d 1009, 1011 (Ill. App. Ct. 1982) ("The contract must be undertaken for the plaintiff's direct benefit and the contract itself must affirmatively make this intention clear."); *Goldfarb v. Bautista Concrete, Inc.*, 126 N.E.3d 516, 521 (Ill. App. Ct. 2019) (applying requirement that there "must be evidence of express terms in the contract identifying the third-party beneficiary" to agreement that was either "written or oral").

Plaintiffs do not support their conclusory assertions concerning their purported third-party beneficiary status with any allegations about the terms of any contract to which the Jump Entities agreed. Nor do Plaintiffs even specify that any *Jump Entity had the intent* to directly benefit Plaintiffs as Illinois law requires. *See Quinn*, 168 F.3d at 334; *F.W. Hempel & Co.*, 721 F.2d at 614 ("[I]t is the Court's task to scrutinize the intention of the parties at the time they entered into the contract."). Where, as here, no agreement "names" Plaintiffs "as a beneficiary," "defines a class of beneficiaries to which [they] belong[]," or implies the same, Plaintiffs' third-party beneficiary breach of contract claim must be dismissed. *See Jackson Nat'l Life Ins. Co. v. Gofen & Glossberg, Inc.*, 882 F. Supp. 713, 721 (N.D. Ill. 1995) (granting motion to dismiss third-party beneficiary claim by plaintiff investor against defendant trust company holding investor's

securities pursuant to an agreement between the trust company and investor's custodian because plaintiff could not show that the investor was "intended to directly benefit" from agreement by its terms); *see also Quinn*, 168 F.3d at 334 (affirming dismissal of third-party beneficiary breach of contract claim as plaintiff did not "refer[] . . . to any text at all in the contract that would indicate, either explicitly or implicitly, the necessary intent to benefit"); *Menard, Inc. v. U.S. Equities Dev., Inc.*, 2002 WL 314571, at *7 (N.D. Ill. Feb. 28, 2002) (dismissing third-party beneficiary breach of contract claims that failed to "allege that there is an express provision of the contracts . . . that identifies [plaintiff], or a class of which [plaintiff] is a member").

In fact, the contracts on which Plaintiffs rely express exactly the opposite intention, *i.e.*, *not* to benefit third parties, and as such, Plaintiffs simply cannot plead their third-party beneficiary status to evade dismissal of their claim. *See, e.g.*, *Jackson Nat'l Life Ins. Co.*, 882 F. Supp. at 721; *see also Grabianski*, 891 F. Supp. 2d at 1043 (in ruling on motion to dismiss, "the terms of the contract control over inconsistent allegations in the complaint"). As explained *supra* pp. 7–10, the Subject Contracts are alleged to include TMSL's agreements with TFL entities whereby TMSL was loaned LUNA. These contracts plainly *do not* grant Plaintiffs any third-party beneficiary rights. To the contrary, the 2019 Loan Agreement provides:

> This Agreement is ***solely for the benefit of the parties hereto*** and their respective successors and assigns, and ***no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement***.

Ex. 1 § XVIII (emphases added); *see also id.* at Ex. A (Loan Term Sheet "incorporat[ing] all of the terms" of the 2019 Loan Agreement). Likewise, the 2020 Master Loan Agreement, pursuant to which the September 2020 and July 2021 Loan Confirmations were entered, provides:

> ***Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Confirmation hereunder***, ***shall create any rights in favor of*** or impose any obligation upon ***any Person other than the Parties*** and their respective successors and permitted assigns.

Ex. 2 § XVI (emphases added); Ex. 3 at 1 ("The terms of this Loan are specified below and in the Master Loan Agreement."); Ex. 4 at 1 (same). These provisions expressly preclude third-party rights and therefore are flatly "inconsistent" with Plaintiffs' claim that they were "intended third-party beneficiaries" of these contracts between TMSL and TFL.

As to the agreements allegedly made with Prime Trust referenced in the Complaint, Plaintiffs also do not point to any provisions to demonstrate that they are third-party beneficiaries of them. Compl. ¶ 82 ("Jump entered into agreements . . . with . . . *Prime Trust*."); *see also supra* p. 9, fn. 4. Unsurprisingly, these agreements—a standard contract for opening a Prime Trust bank account made by TMSL ("Account Agreement") and an agreement pursuant to which Prime Trust could submit indications of trading interest to TMSL ("OTC Trading Agreement")—also undermine Plaintiffs' third-party beneficiary theory. These contracts are clear that TMSL did not undertake any obligation for the benefit of Prime Trust's customers. Ex. 5 (Account Agreement); Ex. 6 (OTC Trading Agreement). The OTC Trading Agreement provides that neither TMSL nor Prime Trust "will be providing any service to the other" and that each party "will enter Transactions ***solely for its own respective benefit*** and ***not for the purpose of benefiting the other Party***, such as by providing a service to the other Party." Ex. 6 (OTC Trading Agreement) § 5 (emphases added). TMSL and Prime Trust also agreed that they "will have no obligation to enter any Transactions with each other," *id.* § 1, and further, that TMSL would not have "any obligation to send any price stream to, or enter any trades on" the trading platform, *see also id.* § 11. The Account Agreement also does not express any intent to benefit holders of UST that sought to redeem their UST for dollars through transactions routed through Prime Trust: the contract concerns only TMSL's bank account and confirms that it was an entirely "self-directed Account

that is managed" by TMSL and for which Prime Trust acted "solely as custodian." Ex. 5 (Account Agreement) § 2.

In sum, the "pertinent question" is whether an actual "contract" contains "express language identifying" investors like Plaintiffs "by name or its functional equivalent." *Quinn*, 168 F.3d at 334.[12] By failing to allege terms in any of the Subject Contracts demonstrating their third-party beneficiary standing (an unsurprising state of affairs given the agreements' terms expressly to the contrary), Plaintiffs "practically conced[e]" that they "cannot meet Illinois's high standard." *Id*. The claim must therefore be dismissed. *Id*.; *see, e.g.*, *United Lab'ys, Inc. v. Savaiano*, 2007 WL 4162808, at *7 (N.D. Ill. Nov. 19, 2007); *Larue v. Mills*, 2019 WL 3195140, at *6 (N.D. Ill. July 15, 2019) (granting motion to dismiss third-party beneficiary breach of contract claim based on agreement that "[b]y its plain terms . . . rejects an intent to benefit anyone other than its parties"); *Jackson Nat'l Life Ins. Co.*, 882 F. Supp. at 721; *Menard, Inc.*, 2002 WL 314571, at *7.

### 3. Plaintiffs Do Not Plausibly Allege the Contractual Obligation Purportedly Breached By the Jump Entities

Even assuming Plaintiffs were third-party beneficiaries of any of the alleged Subject Contracts, Plaintiffs' breach of contract claim fails for the independent reason that they do not plausibly allege the existence of any contractual obligation that required the Jump Entities to buy unlimited quantities of UST during a market collapse. While the claim may be dismissed on this

[12] For this reason, to the extent Plaintiffs seek to rely on their conclusory allegations of the Jump Entities' "course of performance" or the "structure" of how UST transactions operated, Compl. ¶ 83, these allegations also cannot provide a basis to infer their third-party beneficiary standing. *Valley Air Serv. v. Southaire, Inc.*, 2009 WL 1033556, at *15 (N.D. Ill. Apr. 16, 2009) ("The problem with this argument is that the court must focus on the time when a contract is executed, not when it is performed."); *see also F.W. Hempel & Co.*, 721 F.2d at 615. The required intent must appear in the agreement's terms, not elsewhere. *See Vilter Mfg. Co. v. Loring*, 136 F.2d 466, 469 (7th Cir. 1943) (affirming dismissal where defendant's alleged obligation to plaintiff was not "borne out by the contract").

defect alone, the documents upon which the Complaint relies, including the agreements that do exist, further demonstrate that the Jump Entities did not have that obligation.

**a. Plaintiffs Fail To Plead the Existence of a Valid and Enforceable Contractual Obligation With Terms That the Jump Entities Purportedly Breached**

Under Illinois law, a breach of contract claim "must be predicated on a valid and enforceable contractual obligation." *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007). A valid and enforceable contract requires an offer, acceptance, and consideration, and it must be "sufficiently definite so that its terms are reasonably certain and able to be determined." *Halloran v. Dickerson,* 679 N.E.2d 774, 782 (Ill. App. Ct. 1997). "No contract exists under Illinois law, and, indeed, under principles of general law, if the agreement lacks definite and certain terms; nor is a contract formed by an offer that itself lacks definite and certain material terms and does not require such terms to be supplied by an acceptance." *Ass'n Benefit Servs., Inc.*, 493 F.3d at 850; *Yash Venture Holdings, LLC v. Moca Fin., Inc.*, 116 F.4th 651, 657 (7th Cir. 2024) ("Illinois law is clear: an oral agreement, like any other contract, 'must be sufficiently definite as to its material terms' to be enforceable.") (citation and quotations omitted). An agreement is not sufficiently definite to be enforceable unless "the court is enabled from the terms and provisions thereof . . . to ascertain what the parties have agreed to do." *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, 547 F.3d 882, 888 (7th Cir. 2008) (quoting *Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991)).

Rather than plead the terms of any single agreement, Plaintiffs sweepingly assert that "under" an unspecified number of Subject Contracts, "Jump agreed to provide UST liquidity and market-making services." Compl. ¶ 82; *see also id.* ¶ 2. But Plaintiffs do not "give sufficient context to the offer, acceptance, and consideration" of any alleged terms of the purported "liquidity and market-making" obligations, and their breach-of-contract allegations are therefore "too vague

to state a claim that is plausible on its face." *See Aleshire v. Harris, N.A.*, 2009 WL 10701866, at *4 (N.D. Ill. Oct. 27, 2009); *see also Ass'n Benefit Servs., Inc.*, 493 F.3d at 850 ("The definite and certain terms requirement serves several important purposes, chief among them to ensure that the parties in fact have reached an agreement and to provide courts with a basis for enforcing the obligations that the parties sought to impose upon one another.").

Plaintiffs specifically fail to allege an agreement as to the essential and material terms of any such liquidity and market-making obligations. Throughout the Complaint, Plaintiffs make clear that the conduct that they claim was in breach of the purported contractual obligations was the Jump Entities' failure to serve as the "standing counterpart through which users could turn UST into cash" so that UST holders could liquidate their holdings and avoid losses during the May 2022 depeg. Compl. ¶ 59. Thus, based on Plaintiffs' own allegations, the material terms of the alleged obligations require that the Jump Entities redeem UST to U.S. dollars at all times, including during a market collapse. But nowhere do Plaintiffs plead that these material terms were agreed upon in any agreement, let alone sufficient facts to demonstrate the offer, acceptance, and consideration for them. Without "any factual allegations supporting an agreement as to th[ese] term[s]," Plaintiffs fail to allege an "enforceable" contractual obligation under Illinois law. *Yash Venture Holdings, LLC*, 116 F.4th 658 (concluding that based on plaintiff's "own theory of the case, there could not have been a breach without agreement as to all of [the] terms regarding the nature" of an "ownership interest" in a company and failure to allege agreement as to that term was fatal to breach of contract claim). And, in fact, as explained above, the OTC Trading Agreement with Prime Trust makes clear that TMSL had no obligation to transact even with Prime Trust, let alone its customers or for the specific purpose of ensuring liquidity during a market collapse. Ex. 6 (OTC Trading Agreement) § 1. Plaintiffs' allegations therefore do not permit the

inference that there exists a valid and enforceable contractual obligation of the kind that the Plaintiffs claim the Jump Entities breached. The claim must therefore be dismissed. *See Hoopla Sports & Ent., Inc. v. Nike, Inc.*, 947 F. Supp. 347, 356 (N.D. Ill. 1996) (granting motion to dismiss breach of contract claim in part for failure to plead the essential terms of the contract); *Trittipo v. O'Brien*, 561 N.E.2d 1201, 1207 (Ill. App. Ct. 1990) (enforceable oral contract requires "definite and certain" terms).

Perhaps because Plaintiffs are unable to allege any particular agreement with the specific terms of the purportedly breached contractual obligation, Plaintiffs incoherently allege that the obligation "*arose*" somehow from: (i) the collective "agreements' express 'liquidity provider' and 'market maker' language," which Plaintiffs neither quote nor describe in the Complaint despite alleging that such language was "express"; (ii) "the operational structure involving Wallet Apps and Prime Trust that routed all user flow to Jump"; and (iii) "Jump's course of performance." Compl. ¶ 83 (emphasis added). Such allegations are nothing more than mere "labels" and "conclusions" that are "not enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (citation omitted). Plaintiffs' allusions to "the operational structure" for Wallet App transactions that routed "user flow to Jump" and "Jump's course of performance," moreover, do not, as a matter of law, suffice to allege the specific terms that the Jump Entities supposedly breached.

Under Illinois law, a court determines whether "a contract is sufficiently definite and certain to be enforceable" based upon the "*terms and provisions thereof*," and it is based on such terms and provisions that the court must "*ascertain what the parties have agreed to do*." *Ass'n Benefit Servs., Inc.*, 493 F.3d at 850 (emphasis added). Allegations concerning the Jump Entities' purported "course of performance" and the "operational structure" of UST transactions necessarily

relate to conduct that occurred after the Jump Entities' purported agreements to provide liquidity and market making services for such UST transactions. As such, for the same reason that these allegations cannot be a basis upon which to allege that Plaintiffs are third-party beneficiaries of any agreement, *see supra* p. 22, fn. 12, they also simply do not "help in alleging what [the Jump Entities] *promised to do* at the time of formation." *See Glob. Tech. & Trading, Inc. v. Satyam Comput. Servs. Ltd.*, 2011 WL 308162, at *1 (N.D. Ill. Jan. 28, 2011) (emphasis in original). Even assuming such allegations could be considered to inform what the parties meant by terms that Plaintiffs nowhere identify, they could only be relevant to the extent those unidentified terms were ambiguous. *Mach. Tool Tech. 21, Inc. v. United Grinding Techs., Inc.*, 2003 WL 1524646, at *5 (N.D. Ill. Mar. 21, 2003) (explaining "course of performance is relevant to show the meaning that the parties to an agreement have attached to that contract being performed"). Here, the terms are not ambiguous—they are non-existent. And Plaintiffs, in any event, allege nothing about the operational structure and course of performance that would allow an inference that "Jump" promised to buy every sell order in a market collapse.

#### b. Plaintiffs' Factual Allegations Undermine Their Implausible Theory That the Jump Entities Contractually Agreed To Redeem the UST Held By Investors During the Terra Ecosystem Collapse

The documents on which Plaintiffs rely contradict their allegation that the Jump Entities were contractually required to purchase UST every time an entire class of investors wanted to sell UST regardless of market conditions. Dismissal is therefore especially warranted where, as here, Plaintiffs' own allegations undermine their claim. *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) (affirming order granting motion to dismiss with prejudice and explaining that court may "consider any facts set forth in the complaint that undermine the plaintiff's claim," including "documents referenced in the pleading if they are central to the claim").

*First*, Plaintiffs' allusion to the "agreements' express 'liquidity provider' and 'market maker' language," Compl. ¶ 83, is not based on any contractual term or provision. Rather, it appears to be based solely on various communications involving TFL's founder Do Kwon. *Id.* ¶¶ 40, 43, 51. None of these communications suggests the existence of any contractual obligation that required the Jump Entities to liquidate Plaintiffs' UST to dollars during the collapse of the Terra ecosystem. If anything, they *undermine* Plaintiffs' theory.

The Complaint cites: (1) an email from Kwon to Terra investors stating that "Jump" would "deploy its own resources to improve liquidity of Terra and Luna," *id.* ¶ 40; (2) an email in which Kanav Kariya stated that a Jump affiliate would "support trading on terra stable coin pairs . . . and help maintain the peg," *id.* ¶ 43; and (3) statements by Kwon in a June 30, 2021 email referring to "Jump" as a "market maker" and describing how "Jump" would make deposits to Prime Trust, *id.* ¶ 51. The statements from these communications that are quoted in the Complaint concern plans in which TMSL would borrow UST from TFL and supply UST in the open market to make it available for purchases by third parties—not plans for TMSL to accept all *sales of UST by third parties*. Nowhere in those communications (or anywhere else) does any Jump Entity take on an unconditional obligation to always purchase UST any time someone wanted to sell.

Kwon's statement from June 2021, for example, is clear on its face that his reference to "PrimeTrust UST liquidity provision" concerned "liquidity" in the sense of *depositing* UST in a Prime Trust bank account to make it available for investor purchases. *Id.* ¶ 51 ("1) TFL will lend you UST inventory"; "2) You deposit this UST in Prime Trust – ***when users buy UST from Prime Trust***, PT credits your account with USD and withdraws UST to send to users"; "3) When the balance falls . . . we repeat 1 and 2 . . . .") (emphasis added). That "work needed from [J]ump's side" is described by Kwon as "minimal" and "simple." *Id.* None of these statements suffice to

allege any definite terms of any contractual obligation at all. Moreover, these emails say nothing about any Jump entity ever agreeing to *purchase* any UST from Prime Trust or its customers. Nowhere is there even a hint that somehow a Jump Entity took on an extraordinary obligation to commit "*tens of millions*" (and potentially *billions*) of dollars as a "stand-in" counterparty to investors selling their UST to exit a collapsing market. *Id.* ¶¶ 1, 4

*Second*, Plaintiffs include as Subject Contracts certain agreements that do exist but cannot, by their terms, provide the contractual basis for Plaintiffs' fictional obligation by the Jump Entities to ensure that the UST holders could liquidate their investments when UST experienced a market event.

As Plaintiffs are aware, none of the Loan Agreements contain any terms that support the asserted contractual obligations they claim the Jump Entities breached. Rather, these agreements—the 2019 Loan Agreement and the September 2020 and July 2021 Loan Confirmations (which incorporate the terms of the 2020 Master Loan Agreement)[13]—relate to loans of LUNA and other crypto assets from TFL to TMSL. As Plaintiffs allege (though wrongly attribute to "Jump"), these agreements set forth various terms related to the loaned tokens, including with respect to the duration of the loan, the deadline for their return, and options to purchase the tokens at specified prices. Compl. ¶ 39; *see also, e.g.*, Ex. 1 (Loan Term Sheet attached as Exhibit A to the 2019 Loan Agreement identifying TMSL as "Borrower," TFL as "Lender" of 30 million LUNA and granting three call options). None of their provisions relate to any redemption of UST held by investors or any trading with such investors.

---

[13] *See* Ex. 3 (September 2020 Loan Confirmation) at 1 ("The terms of the Loan are specified below and in the Master Loan Agreement."); Ex. 4 (July 2021 Loan Confirmation) at 1 (same).

TMSL's agreements with Prime Trust do concern the custody and trading of crypto assets, but these contracts squarely foreclose Plaintiffs' allegations about the Jump Entities' liquidity and market-making obligations. As explained *supra* pp. 21–22, in the OTC Trading Agreement, TMSL and Prime Trust explicitly agreed that they "will have ***no obligation to enter any Transactions with each other***." Ex. 6 (OTC Trading Agreement) § 1 (emphasis added); *see also id.* § 11 (further disclaiming that TMSL would have "any obligation to send any price stream to, or enter any trades on" the trading platform). These agreements are also plain that TMSL did not provide any service for Prime Trust or its customers. *Id.* § 5 (providing that neither TMSL nor Prime Trust "will be providing any service to the other" and that each party "will enter Transactions solely for its own respective benefit and not for the purpose of benefiting the other Party, such as by providing a service to the other Party"); Ex. 5 (Account Agreement) § 2.

Lastly, the Loan Agreements between TMSL and TFL entities, as well as each of the Account Agreement and OTC Trading Agreement between TMSL and Prime Trust, contain merger clauses and provisions that do not permit contractual modifications or amendments to them except by signed writing. *See* Ex. 1, (2019 Loan Agreement) § XI ("Modifications"); *id.* § XII ("Entire Agreement"); Ex. 2 (2020 Master Loan Agreement) § XIII ("Modifications"); *id.* § XV ("Entire Agreement"); Ex. 5 (Account Agreement) § 21 ("Entire Agreement, Amendments"); Ex. 6 (OTC Trading Agreement) § 19 ("This Agreement sets forth the entire agreement and understanding between the Parties relating to the subject matter herein and supersedes all prior agreements, discussions, understandings, or representations, either oral or in writing, relating to this subject matter. No modification or amendment to this Agreement . . . will be effective unless in writing signed by the Party to be charged."). Accordingly, these provisions foreclose the possibility that there could be any contractual obligation purportedly breached by the Jump Entities

that arose from oral amendments or modifications subsequent to these agreements, as Plaintiffs' attempt to allege. They also demonstrate the implausibility that some other agreements exist with TFL or Prime Trust concerning these agreements' respective subject matters that could be part of the Subject Contracts assertedly breached by the Jump Entities and especially the implausibility that such other agreements would have terms that are the exact opposite of the terms of these written agreements. Because Plaintiffs fail to plead any valid and enforceable contractual obligation that the Jump Entities plausibly breached, the claim must be dismissed.

### B. Plaintiffs Fail To State a Claim for Violation of the Illinois Consumer Fraud and Deceptive Practices Act (Count IV)

Plaintiffs' claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505) ("ICFA") fails for three independent reasons: it is (1) untimely, (2) insufficiently connected to Illinois, and (3) fails to satisfy Rule 9(b)'s particularity pleading requirement applicable to ICFA claims based on deception.

#### 1. The ICFA Claim Is Untimely

Plaintiffs' ICFA claim is untimely under the applicable three-year statute of limitations. The limitations period begins when a plaintiff "knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Campbell v. Freedom Mortg. Corp.*, 2023 WL 1345652, at *4 (N.D. Ill. Jan. 31, 2023) (quoting *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 441 (7th Cir. 1994)). Plaintiffs allege that they were injured in May 2022, when "UST rapidly lost its value and plummeted to zero" while they "attempted to redeem their UST" but were "locked in their investments." Compl. ¶ 3; *id.* ¶¶ 61–63. Yet Plaintiffs did not assert their ICFA claim against the Jump Entities until four years later, when this action was filed in May 2026. The ICFA claim is therefore time-barred. *See Theriot v. Captain James*

*Sprinkle, Inc.*, 30 F.3d 136 (7th Cir. 1994) (affirming dismissal on statute-of-limitations grounds where untimeliness was apparent from the face of the complaint).

Apparently recognizing this, Plaintiffs invoke the discovery rule and fraudulent-concealment doctrine to argue they "could not reasonably discover Defendants' role in the misconduct until late 2023" and that they "thereafter acted diligently." Compl. ¶ 113; *id.* ¶ 71. But application of the discovery rule or tolling based on fraudulent concealment is not warranted here. The discovery rule delays accrual only until a plaintiff "knew or reasonably should have known of the injury and that the injury was wrongfully caused." *Am. Fam. Mut. Ins. Co. v. Krop*, 120 N.E.3d 982, 987–88 (Ill. 2018); *accord Campbell*, 2023 WL 1345652, at *4 (explaining the discovery rule is "already baked into the ICFA accrual rule"). It does not postpone the limitations period until a plaintiff discovers who injured them. *See Guarantee Trust Life Ins. Co. v. Kribbs*, 68 N.E.3d 1046, 1054 (Ill. App. Ct. 2016) (collecting cases demonstrating that Illinois courts have "repeatedly rejected" the argument that the "identity of the party who caused [the plaintiff's] injury is a prerequisite to the commencement of the running of the statute of limitations.").[14]

Plaintiffs' reliance on fraudulent concealment also fails. Tolling based on fraud—whether by equitable estoppel or Illinois' fraudulent-concealment statute—requires an affirmative act of concealment separate from the underlying wrongdoing. *Tartan Constr., LLC v. New Equip. Servs.*

[14] Plaintiffs allege that regulatory filings in 2023 identified an unnamed "Firm-1." Compl. ¶ 70. These filings refer to the SEC's complaint against TFL filed on February 26, 2023. Ex. A, Compl., *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346 (S.D.N.Y. Feb. 26, 2023), Dkt. No. 1. Plaintiffs did not need to know the identity of "Firm-1" to file suit. Plaintiffs' alleged discovery date of December 2023 is, in any event, demonstrably false. Judicially noticeable facts demonstrate that a reasonably diligent plaintiff would have discovered the facts underlying the ICFA claim far earlier than Plaintiffs assert. *See Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) (affirming district court order dismissing untimely claim on motion to dismiss based on "allegations in the complaint and a few undisputable facts within its judicial-notice power"). Plaintiffs should have known of their claim by at least June 17, 2022, when a different plaintiff filed a putative class action alleging securities fraud by Jump Crypto and TFL, and, by February 2023, the identity of "Jump" when the Second Amended Complaint alleged that "Jump" traded to restore UST's peg in May 2021. Ex. G, Compl. *Patterson v. Jump Trading LLC*, 5:22-cv-03600 (N.D. Cal. June 17, 2022), Dkt. No. 1; Ex. H, Second Am. Compl, *Patterson*, Dkt. No. 102 (N.D. Cal. Feb. 23, 2023).

*Corp.*, 2018 WL 4563079, at *3 (N.D. Ill. Sept. 24, 2018) (dismissing untimely ICFA claim where alleged "failure to disclose information" was same "alleged wrongdoing," not conduct showing that "Defendants deliberately prevented Plaintiff from suing within the statute of limitations period"); *Tate v. Beverly Chrysler Plymouth*, 538 N.E.2d 663, 668 (Ill. App. Ct. 1989). Plaintiffs do not allege that the Jump Entities took any affirmative act beyond the alleged wrongdoing upon which Plaintiffs base their ICFA claim that would have "reasonably induce[d]" them "into not filing a claim." *See Tate*, 538 N.E.2d at 668; *Karpowicz v. Gen. Motors Corp.*, 1997 WL 285943, at *5 (N.D. Ill. May 23, 1997) ("In order to show fraudulent concealment, a plaintiff must show affirmative acts which are calculated to prevent discovery."). Rather, their basis for invoking the fraudulent concealment doctrine—that "Plaintiffs could not reasonably discover Defendants' role in the misconduct until late 2023," Compl. ¶ 113—is premised on the same alleged "unfair and deceptive acts and practices" that Plaintiffs assert the Jump Entities engaged in by "[c]oncealing [their] role in defending the 2021 peg and the true basis of UST's apparent stability," *id.* ¶ 109; *see also id.* ¶ 72 (alleging that Plaintiffs "could not, in the exercise of reasonable diligence, have discovered Defendants' identity and role in the events giving rise to their claims" until "public disclosures and related materials became available on December 28, 2023"). As such, tolling based on the fraudulent-concealment doctrine does not apply as a matter of law.[15]

[15] Even if it were the case that Plaintiffs had a basis to allege fraudulent concealment (which they do not), Plaintiffs certainly had a reasonable amount of time to file their new claim based on alleged deceptive acts. In fact, Plaintiffs admit that at the very latest they learned of "Jump's role" in June of 2023, when Prime Trust purportedly disclosed in discovery responses that Jump Trading was its liquidity provider. Ex. F, Compl. ¶¶ 51, 69, *Ward v. Jump Trading LLC*, 3:25-cv-03989 (N.D. Cal. May 7, 2025), Dkt. No. 1. Illinois courts find that even "less than nine months remaining in the original statutory period" constitutes a "reasonable time within which to file suit." *Tate*, 538 N.E.2d at 668. Plaintiffs, however, do not allege any basis to conclude that they could not investigate and file such a claim during the two years that followed before the limitations period ran in May 2025. In fact, Plaintiffs could have but explicitly chose not to assert any claim based on the alleged market-manipulation or deception underlying the ICFA claim in their California action against Jump Trading and Jump Crypto. Instead, in that case, they expressly "allege[d] only that Jump breached contractual obligations to serve as a liquidity provider and fill investors' orders to

In sum, the ICFA claim is facially untimely, and Plaintiffs' own allegations foreclose their reliance on the discovery rule and the fraudulent-concealment doctrine.

### 2. Plaintiffs Do Not Allege a Sufficient Connection to Illinois

Even were the ICFA claim timely, it must be dismissed because ICFA does not "apply to fraudulent transactions which take place outside Illinois." *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 853 (Ill. 2005); *see also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (explaining that the Illinois Supreme Court has "severely limited the extraterritorial reach of the ICFA") (citing *Avery*, 835 N.E.2d at 852–53). Where, as here, "the only connection with Illinois is the headquarters of [the] defendant" or the allegation that the scheme "emanated" from Illinois, "the ICFA does not apply." *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 340 & n. 10 (N.D. Ill. 1997); *see also, e.g.*, *Camargo v. Abbvie, Inc.*, 2026 WL 115068, at *3 (N.D. Ill. Jan. 14, 2026) (dismissing ICFA claim as "outside Illinois" where non-resident plaintiffs purchased products outside Illinois even though plaintiffs "allege[d]" that pricing strategy was "conceived and implemented" in Illinois, given no other alleged in-state conduct, such as "contact with [the defendant] in Illinois"); *Haught v. Motorola Mobility, Inc.*, 2012 WL 3643831, at *4 (N.D. Ill. Aug. 23, 2012) (dismissing ICFA claim by non-resident despite allegations that defendant's headquarters were located in Illinois from which it "designed its allegedly deceptive scheme," and "misrepresentations emanated from servers located in Illinois").

Plaintiffs are residents of California, Florida, and Washington, not Illinois. Compl. ¶¶ 9–11. They and others allegedly deposited UST into Wallet Apps, including Kash, a product of a "Colorado-based" company, and their orders were transmitted by these apparently non-Illinois companies to Prime Trust, a "Nevada-based trust company." *Id.* ¶¶ 32, 34. Plaintiffs' only attempt

sell." Ex. F, Compl. ¶ 10 & n.1, *Ward v. Jump Trading LLC*, 3:25-cv-03989 (N.D. Cal. May 7, 2025), Dkt. No. 1.

at alleging a connection to Illinois are their conclusory statements that the purported "unfair and deceptive acts and practices occurred primarily and substantially in Illinois" because "many of the decisions, communications, and promotions" "emanated" from Illinois "where Defendants are headquartered." *Id.* ¶ 111. These allegations squarely place Plaintiffs' claim outside of Illinois for purposes of ICFA, requiring dismissal. *See Camargo*, 2026 WL 115068, at *3; *Rohlfing*, 172 F.R.D. at 340; *Haught*, 2012 WL 3643831, at *4.

### 3. Plaintiffs' ICFA Claim Is Insufficiently Pleaded

Plaintiffs also do not sufficiently allege a claim under ICFA, which requires (i) a deceptive act or practice by a defendant, (ii) that a defendant intend a plaintiff's reliance on such deception, (iii) that the deception occur in the course of conduct of trade or commerce, (iv) actual damage to a plaintiff, and (v) that such damage was proximately caused by the defendant. *See Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 575-76 (7th Cir. 2001). Plaintiffs fail to plausibly allege any deceptive act or unfair practice, proximate cause, and intent by each Jump Entity that Plaintiffs rely on such deception.

Plaintiffs' ICFA claim identifies the "unfair and deceptive acts and practices" of which they complain as "including" the following:

- "Misrepresenting the nature and stability of UST and the Terra ecosystem";
- "Concealing Defendants' role in defending the 2021 peg and the true basis of UST's apparent stability"; and
- "Failing to disclose Defendants' conflicts of interest and self-dealing in receiving discounted Luna while promoting UST to consumers."

Compl. ¶ 109. As these allegations all sound in fraud, Plaintiffs must satisfy Rule 9(b)'s heightened pleading standard. *See, e.g.*, *Kahn v. Walmart, Inc.*, 107 F.4th 585, 601 (7th Cir. 2024) (citing *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014)); *Schwebe v.*

*AGC Flat Glass N. Am., Inc.*, 2013 WL 2151551, at *2 (N.D. Ill. May 16, 2013) (holding that courts evaluate concealment cases "under the deception prong of the ICFA").[16]

But Plaintiffs do not allege the who, what, when, where, or how of any deceptive statement, as Rule 9(b) requires. Fed. R. Civ. Proc. 9(b); *see also Camasta.*, 761 F.3d at 737 (affirming dismissal of ICFA claim for failure to plead with particularity the circumstances constituting fraud). Rather, Plaintiffs rely on conclusory, group-pleaded allegations, broadly asserting that the Jump Entities allegedly misrepresented the "nature and stability of UST and the Terra ecosystem" and that the Jump Entities "promot[ed] UST to consumers." *Id.* ¶ 109. They do not identify even one purported misrepresentation made by any of the Jump Entities. *See, e.g.*, *id.* ¶ 110 (asserting that "Jump's misrepresentations and omissions" concerned, apparently, "the availability of UST liquidity" and "its refusal to provide the market-making and liquidity services"). Nor can Plaintiffs bring an ICFA claim based on their allegation that the Jump Entities "conceal[ed] [their] role in defending the 2021 peg and the true basis of UST's apparent stability," because under ICFA, "an 'omission' is an omission from a communication, rather than a general failure to disclose." *Darne v. Ford Motor Co.*, 2017 WL 3836586, at *10 (N.D. Ill. Sep. 1, 2017). Because the Complaint does not allege any statements, there necessarily cannot be any omissions. The Complaint thus offers no insight into what allegedly deceptive statements any Jump Entity actually made to

[16] To the extent that Plaintiffs, by parroting the law of "unfair" practices, also attempt to bring an ICFA claim based on unfair business practices, Compl. ¶ 107, their thin factual allegations on this front suggest that the unfair conduct of which they complain relates only to the Jump Entities' alleged contractual breaches. *Id.* ¶ 108 ("Jump's refusal to fulfill its market maker obligations when execution would result in losses to itself, while Plaintiffs and the Class were left trapped in a collapsing investment, satisfies all three prongs."). But a "breach of contractual promise, without more, is not actionable" under ICFA. *Avery*, 835 N.E. 2d at 844. Accordingly, any claim based on such conduct must be dismissed. Moreover, merely invoking the unfair practices prong based on such legally insufficient allegations does not suffice to "bypass Rule 9(b)'s particularity requirements." *Horan v. Ford Motor Co.*, 2026 WL 395630, at *7–8 (N.D. Ill. Feb. 12, 2026) (rejecting argument that "threadbare recital of the elements of an ICFA unfair practices claim" was adequate to "invoke the 'unfair practice' prong" not subject to 9(b)'s heightened pleading standard) (citation omitted)).

Plaintiffs or how those statements misled them, and the ICFA claim must therefore be dismissed. *See, e.g.*, *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 669 (7th Cir. 2008) (internal quotation marks omitted) (affirming dismissal of fraud claim for failure to "state with particularity who made the fraudulent statement, when the fraudulent statement was made, and how the fraudulent statement was made").

In addition, Plaintiffs' failure to allege any communication by the Jump Entities (let alone a deceptive one) requires dismissal of the claim for lack of proximate cause. The Illinois Supreme Court has held that an ICFA plaintiff must receive, directly or indirectly, a deceptive communication from the defendant. *See De Bouse v. Bayer*, 922 N.E.2d 309, 316 (Ill. 2009). "If a consumer has neither seen nor heard any such statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause." *Id.* They simply cannot get by on their mere assertion that they "suffered actual damages" as "a direct and proximate result of Defendants' violations of the ICFA." Compl. ¶ 112. Here, because Plaintiffs failed to allege any misstatements, they certainly failed to allege that they received a deceptive communication from any of the Jump Entities.

Lastly, the ICFA claim must also be dismissed for failure to plead the Jump Entities' intent to induce reliance. Plaintiffs do not even try to plead any fact to support such intent: their ICFA count asserts nothing more than that "Jump's conduct served only to protect its own trading position and profits," Compl. ¶ 110, and, elsewhere in the Complaint, that "Jump intentionally withheld its central role in defending UST's peg in May 2021," *id.* ¶ 69. These allegations simply do not give rise to any inference that the Jump Entities sought to induce Plaintiffs to rely on any allegedly deceptive acts. *See, e.g.*, *Stewart v. JP Morgan Chase Bank, N.A.*, 2022 WL 294763, at

*3 n.4 (N.D. Ill. Feb. 1, 2022) (dismissing ICFA claim in part for failure to allege intent to induce reliance where plaintiff merely alleged that defendant "knew" of a "fraud").

Accordingly, even if the ICFA claim were not dismissed as untimely or for lack of a sufficient nexus to Illinois, the claim must be dismissed because Plaintiffs utterly fail to plead its critical elements.

### C. Plaintiffs' Remaining State Law Claims Must Be Dismissed

#### 1. Plaintiffs Fail To State a Claim for Conversion (Count II)

The economic loss doctrine bars Plaintiffs' conversion claim. Under Illinois law, a "plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract." *Anderson Elec. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (Ill. 1986). The doctrine rests on the principle that "when a contract sets out the duties between parties, recovery should be limited to contract damages even though recovery in tort would otherwise be available under the common law." *Meadoworks, LLC v. Linear Mold & Eng'g, LLC*, 2020 WL 5365977, at *1 (N.D. Ill. Sept. 8, 2020). Thus, a tort claim such as conversion must be dismissed when brought "for purely economic losses that arises from the [parties'] contractual relationship." *Id.* (granting motion to dismiss conversion claim where "facts and theory for the [conversion and breach of contract claims] overlap"); *see also MD Spine Sols., LLC v. UnitedHealth Grp., Inc.*, 2022 WL 124160, at *5 (N.D. Ill. Jan. 13, 2022) (dismissing conversion claim as duplicative of dismissed third-party beneficiary breach of contract claim based on authority addressing the economic loss doctrine); *Maroon Soc'y v. Unison Consulting Inc.*, 2020 WL 5076688, at *9 (N.D. Ill. Aug. 26, 2020) (dismissing negligence claim based on economic loss doctrine as based on same alleged obligations underlying the dismissed contract claim); *ACW Flex Pack LLC v. Wrobel*, 2023 WL

4762596, at *14 (N.D. Ill. July 26, 2023) (dismissing conversion claim based on economic loss doctrine under Illinois law).

Here, Plaintiffs' allegations demonstrate that their tort claim is not based on anything more than the purported breach of the same contractual duties relating to the Jump Entities' supposed market-making and liquidity services. In alleging conversion, Plaintiffs seek recovery of the "corresponding cash proceeds of" their UST sell orders, and they claim the Jump Entities "interfered with that possessory right." Compl. ¶ 93. But Plaintiffs' alleged right to dollars in exchange for their UST and the alleged wrongfulness of the Jump Entities' possession over such dollars are premised upon the same alleged "market maker" and "liquidity" obligations that are the subject of their contract claims. *Id.* ¶ 92 ("Jump wrongfully exercised dominion and control . . . by refusing to honor the very liquidity function it had undertaken to provide."); *see also, e.g., id.* ¶ 94 ("Plaintiffs' and the Class's sell orders . . . constituted demands that Jump perform its undertaking" and "[r]ather than honor those orders, Jump declined to execute them, notwithstanding that it had undertaken to act as the market maker and liquidity provider for that market."). Plaintiffs further allege that "Jump" "[p]ursuant to its agreements with Terraform . . . served as the market maker and liquidity provider through which investors could purchase and sell UST" and that the refusal to execute their sales was in "derogation" of Plaintiffs' rights. *Id.* ¶ 92. In essence, they allege that the Jump Entities "violated state tort law for the same reasons that [they] breached the [Subject Contracts]." *ACW Flex Pack LLC*, 2023 WL 4762596, at *14. As such, Plaintiffs' conversion claim improperly seeks recovery for harm to "compensat[e] for an economic loss" in the "loss of the benefit of a bargain." *Braman v. Woodfield Gardens Assocs., Realcorp Invs. I*, 715 F. Supp. 226, 229 (N.D. Ill. 1989) (citing *Fireman's Fund Am. Ins. Cos. v. Burns Elec. Sec. Servs., Inc.*, 417 N.E.2d 131, 133–34 (Ill. App. Ct. 1980)). Plaintiffs'

conversion claim must therefore be dismissed. *See, e.g.*, *id.*; *MD Spine Sols., LLC*, 2022 WL 124160, at *5; *ACW Flex Pack LLC*, 2023 WL 4762596, at *14; *AIT Worldwide Logistics, Inc. v. Pac. Coast Container, Inc.*, 2024 WL 4041323, at *6 (N.D. Ill. Sept. 4, 2024) (dismissing conversion claim based on economic loss doctrine).

Even if Plaintiffs' conversion claim were to survive the economic loss doctrine, the claim must nevertheless be dismissed for failure to state a claim. "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *Horbach v. Kaczmarek*, 288 F.3d 969, 978 (7th Cir. 2002) (quoting *In re Thebus*, 483 N.E.2d 1258, 1264 (Ill. 1985)). The "asserted right to money normally will not support a claim for conversion"—only where a "specific fund or specific money in coin or bills" is at issue. *Id.* (quotations and citation omitted). Moreover, the "plaintiff's right to the money must be absolute," which requires alleging that the "money claimed . . . *at all times* belonged to [Plaintiffs] and that the [Jump Entities] converted it to [their] own use." *Id.* (quoting *In re Thebus*, 483 N.E.2d at 1261) (emphasis in original). Plaintiffs allege that the money they seek return of are the "corresponding cash proceeds" of their attempted UST sales. Compl. ¶ 93. But their allegations fail to demonstrate that such "money was in any way segregated from other money, placed in an exclusive account, or otherwise made distinctive." *Payton v. Cnty. of Kane*, 301 F. Supp. 2d 835, 839 (N.D. Ill. 2004), *aff'd sub nom. Payton v. Cnty. of Carroll*, 473 F.3d 845 (7th Cir. 2007). Rather, Plaintiffs' conclusory allegations that the funds are "connected to particular transactions and an identifiable mechanism for payment" suggests, at best, that the "specific dollar amount" of the money is identifiable, which is not the same as demonstrating that the money itself was "segregated or otherwise earmarked." *Id.* ¶ 95; *see also Payton*, 301 F. Supp. 2d at 839.

Even assuming such funds could be characterized as specific chattel as necessary to allege a conversion claim, Plaintiffs do not plead sufficient facts to demonstrate that "the money at all times belonged unconditionally" to them. *Horbach*, 288 F.3d at 978. Plaintiffs allege that their unconditional right for those dollars arose when Plaintiffs attempted to sell their purchased UST. *Id.* at ¶ 93 (alleging Plaintiffs "already paid money to acquire UST" and "no further condition remained" than to "sell their UST at Jump's quoted or operative market price"). According to these allegations, the Jump Entities therefore first obtained such funds from Plaintiffs when they purchased UST. Between the time that the Jump Entities allegedly received money from Plaintiffs in exchange for the UST they purchased and before Plaintiffs sought to exchange their UST for dollars, the funds are not sufficiently alleged to have belonged to Plaintiffs and, accordingly, the Jump Entities' possession of that money "cannot be described as unauthorized or wrongful in the sense that a claim for conversion requires." *Horbach*, 288 F.3d at 978; *see also Sharma v. Rhino Holdings Aurora, LLC*, 2025 WL 327779, at *5 (N.D. Ill. Jan. 29, 2025) (dismissing conversion claim where money was voluntarily paid pursuant to terms of agreement and "entitlement to reimbursement could arise only at termination"). Accordingly, the conversion claim must also be dismissed for failure to state a claim.

**2. Plaintiffs Fail To State a Claim for Unjust Enrichment (Count III)**

Plaintiffs' unjust enrichment claim should be dismissed.

Plaintiffs ostensibly bring their unjust enrichment claim in the alternative to their breach of contract claim, Compl. ¶¶ 99–104, but they fail to comply with the applicable pleading requirements to bring such an alternative claim. As the Seventh Circuit has explained, "[i]n Illinois recovery for unjust enrichment is unavailable where the conduct at issue is the subject of an express contract." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). And although a party may allege unjust enrichment in the alternative, that "inconsistent-pleading option" is "limited"

and requires plaintiffs to plead that "if there is *not* an express contract, then the defendant is liable for unjustly enriching himself at my expense." *Id.* In other words, "while a plaintiff may plead breach of contract in one count and unjust enrichment [in another] . . . , it may not include allegations of an express contract which governs the relationship of the parties, in the count[] for unjust enrichment." *Id.* Plaintiffs make that fatal error here, as the unjust enrichment count improperly incorporates allegations of their breach of contract claim. Compl. ¶ 99. The claim must therefore be dismissed. *See, e.g.*, *Cohen*, 735 F.3d at 615; *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 887 (7th Cir. 2022) ("[A] party may not incorporate by reference allegations of the existence of a contract between the parties in the unjust enrichment count."); *Glob. Tech. & Trading, Inc.*, 2009 WL 4788693, at *2 (dismissing unjust enrichment claim due to "incorporation of . . . allegations of contract").

Absent Plaintiffs' allegations of express agreements, the unjust enrichment claim cannot stand as it is premised on the same improper conduct by the Jump Entities that is central to the failed ICFA claim. Compl. ¶ 102 ("Jump cannot . . . retain the benefits derived from Plaintiffs and the Class's funds while disclaiming responsibility for providing the very liquidity that induced them to commit those funds"). As Plaintiffs have no fraud claim, *see supra* pp. 30–37, the unjust enrichment claim must fail too. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) ("[R]esolution of the fraud claim . . . is dispositive of the unjust enrichment claim as well.").

## II. If This Court Were To Find That Plaintiffs Properly Pleaded That They Are Third-Party Beneficiaries of the "Subject Contacts," Then Their Claims Are Subject To Arbitration

If the Court were to conclude that Plaintiffs sufficiently alleged they are third-party beneficiaries of the "Subject Contracts," then Plaintiffs must arbitrate their claims because they rest on alleged violations of at least one contract with a mandatory arbitration clause.

### A. The Contract At Issue Requires Arbitration

To the extent that Plaintiffs' incoherent Complaint rests on actual (as opposed to imaginary) contracts, Plaintiffs' case theory appears to hinge on the 2019 Loan Agreement under which TMSL obtained from TFL loans of LUNA and options to purchase LUNA. Compl. ¶¶ 2, 38. Plaintiffs appear to allege that the 2019 lending arrangement served as the foundation for the purported liquidity obligations at issue here. They allege that in exchange for receiving "options to buy other Terraform assets at deep discounts" under the 2019 loans, "Jump" agreed "to supply liquidity for UST transactions, to serve as UST's market-maker and to help UST maintain its one-dollar 'peg.'" *Id.* ¶ 2; *see also* ¶ 38 & n.2 (alleging that "[b]eginning in November 2019 . . . Terraform entered multiple agreements with Jump whereby Jump would receive Luna from Terraform in exchange for liquidity provider services"). Indeed, as Plaintiffs tell it, "[r]ather than receiving a fee for its [liquidity provider] services, Jump obtained loans of Luna tokens" which it then had the option to purchase at specified prices under the 2019 Loan Agreement. *Id.* ¶ 39. But that contract, on which Plaintiffs seek to build their case, contains a broad arbitration provision requiring "arbitration in the Cayman Islands" of "dispute[s] aris[ing] out of or relat[ing]" to it or its breach. Ex. 1 (2019 Loan Agreement) § IX.[17] Accordingly, and for the reasons detailed below, Plaintiffs' reliance on the 2019 Loan Agreement requires arbitration of their claims in the Cayman Islands.[18]

---

[17] "The Court may consider documents outside the pleadings in ruling on a motion to compel arbitration." *Shapiro v. Residential Homes for Rent, LLC*, 2023 WL 3436401, at *2 n.2 (N.D. Ill. May 12, 2023).

[18] To support their claims, Plaintiffs also refer to additional loan contracts, namely the September 2020 Loan Confirmation, Compl. ¶ 44, and the July 2021 Loan Confirmation, *id.* ¶ 56 (alleging that "[in] return for Jump's UST liquidity services," TFL also "granted Jump the right to acquire up to 61.5 million Luna from [TFL] at a fixed strike price of $0.40 per token" under a separate July 21, 2021 contract). However, those contracts are subject to the 2020 Master Loan Agreement, which has an arbitration clause providing for mandatory "arbitration administered in Chicago, Illinois by the American Arbitration Association under its Commercial Arbitration Rules . . . ." Ex. 2 § XI.

### B. Plaintiffs Are Estopped From Avoiding Arbitration

Because Plaintiffs assert claims in reliance on the 2019 Loan Agreement and expressly allege to be third-party beneficiaries of that contract, they are bound by its mandatory arbitration clause. "[T]he obligation to arbitrate a dispute is not limited only to those who have personally signed the written agreement," but also extends to those who, like Plaintiffs here, "knowingly seek[] the benefits of the contract containing the arbitration clause." *Int'l Ins. Agency Servs., LLC v. Revios Reinsurance U.S., Inc.*, 2007 WL 951943, at *3 (N.D. Ill. Mar. 27, 2007). In such cases, "[a] non-signatory party is estopped from avoiding arbitration . . . ." *Id.*; *see Lefkovitz v. Wagner*, 1998 WL 312001, at *3 n.1 (N.D. Ill. June 4, 1998) (Bucklo, J.).

#### 1. Federal Common Law Supplies the Equitable Estoppel Test

As a threshold matter, whether Plaintiffs, as non-signatories to the 2019 Loan Agreement, should be bound by the arbitration clause in that contract is a question of federal law. That is because that arbitration clause falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), which applies to commercial contracts to which one or more non-U.S. citizens are parties. *See* 9 U.S.C. § 202; *Jain v. de Méré*, 51 F.3d 686, 689 (7th Cir. 1995) (holding New York Convention governs commercial arbitration agreement "unless [1] it is between two United States citizens, [2] involves property located in the United States, and [3] has no reasonable relationship with one or more foreign states"). Here, the arbitration contract in the 2019 Loan Agreement is a commercial contract between non-U.S.

citizens.[19] Accordingly, federal substantive law governs whether an arbitration agreement falling under the New York Convention may be enforced by or against non-signatories.[20]

### 2. Plaintiffs' Own Allegations Require Arbitration of Their Claims

Federal law estops plaintiffs from refusing to arbitrate their dispute where, as here, their case rests on alleged breaches of contract with mandatory arbitration clauses covering the dispute. *Int'l Ins. Agency Servs., LLC*, 2007 WL 951943, at *3. The Seventh Circuit has long recognized that "[plaintiffs] cannot have it both ways. [They] cannot rely on the contract when it works to [their] advantage, and repudiate it when it works to [their] disadvantage." *Hughes Masonry Co. v. Greater Clark Cnty. Sch. Bldg. Corp.*, 659 F.2d 836, 839 (7th Cir. 1981) (citations omitted); *see also* *Scheurer v. Fromm Fam. Foods LLC*, 202 F. Supp. 3d 1040, 1044 (W.D. Wis. 2016) (recognizing "Seventh Circuit has applied equitable estoppel to prevent nonparties from refusing to arbitrate when they knowingly seek the benefits of a contract containing an arbitration clause"), *aff'd*, 863 F.3d 748 (7th Cir. 2017). "The touchstone of this form of estoppel thus is whether the non-signatory has brought suit against the signatory premised upon the agreement that contains the arbitration clause at issue, thus seeking the agreement's direct benefits." *Gersten v. Intrinsic Techs., LLP*, 442 F. Supp. 2d 573, 579 (N.D. Ill. 2006).

[19] The 2019 Loan Agreement was executed by TMSL, Compl. ¶¶ 38 n.2, 44, 56 n.6, "a Cayman Islands corporation," *id.* ¶ 14. That alone is sufficient for the New York Convention to apply. Moreover, the counterparty to that contract is also a non-U.S. citizen, namely TFL, a Singapore company. Ex. 1 at 1. The same is true for the 2020 Loan Agreement, which is between TMSL and Terraform Labs Limited, a British Virgin Islands company. Ex. 2.

[20] *See, e.g.*, *Setty v. Shrinivas Sugandhalaya LLP*, 3 F.4th 1166, 1168 (9th Cir. 2021) (holding that in cases involving the New York Convention, federal law applies "in determining the arbitrability of federal claims by or against non-signatories to an arbitration agreement") (internal citations omitted)); *Outokumpu Stainless USA, LLC v. Coverteam SAS*, 2022 WL 2643936, at *6 (11th Cir. July 8, 2022) (Tjoflat, J., concurring) (noting that federal law applies to questions regarding enforcement of arbitral agreements by nonsignatories because of "uniquely federal interest" in this issue); *cf.* *Certain Underwriters at Lloyd's London v. Argonaut Ins. Co.*, 500 F.3d 571, 581 (7th Cir. 2007) (finding federal law governs interpretation of international arbitral agreements because of "the substantial federal interests in uniform interpretation of agreements under the [New York] Convention").

In determining whether a non-signatory has sought a direct benefit from a contract, courts look at "the non-signatory's own allegations regarding its relationship with the contract." *Int'l Ins. Agency Servs., LLC*, 2007 WL 951943, at *4. Here, Plaintiffs allege that the "Subject Contracts" giving rise to their claims include the 2019 Loan Agreement with the arbitration clause, Compl. ¶¶ 82, 84, and then specifically allege those "Subject Contracts were expressly intended to, and did, benefit UST investors, ***including Plaintiffs***." *Id.* ¶ 85 (emphasis added). According to Plaintiffs, they "were intended third-party beneficiaries of the Subject Contracts because the primary purpose and effect of those contracts was to provide [them] with liquidity and protection against a run on UST, and [the Jump Entities] knew or reasonably should have known that UST investors would rely on the terms of the Subject Contracts and seek to enforce them if [the Jump Entities] failed to provide liquidity or meet [their] market making obligations." *Id.* On those bases, Plaintiffs accuse the Jump Entities of breaching the 2019 Loan Agreement, as one of the "Subject Contracts," and claim that said breach caused Plaintiffs' "severe financial losses." *Id.* ¶¶ 86–87.

Plaintiffs' non-contractual claims also allege conduct based on the 2019 Loan Agreement, including the premise that this contract gave rise to the Jump Entities' alleged liquidity and market-making obligations. Plaintiffs' conversion claim centers on allegations that the Jump Entities "wrongfully exercised dominion and control over Plaintiffs' and the Class's property by refusing to honor the very liquidity function [the Jump Entities] had undertaken to provide" in exchange for "receiv[ing] Luna from Terraform" under the 2019 Loan Agreement. Compl. ¶¶ 38; *id.* ¶ 92 (referring to liquidity function as "[p]ursuant to [the Jump Entities'] agreements with Terraform"). Similarly, Plaintiffs claim the Jump Entities were unjustly enriched by "accept[ing] valuable consideration" to "serve as the market maker and liquidity provider for UST" through the Loan Agreements and refusing to provide those alleged services. *Id.* ¶¶ 102–03; *id.* ¶ 100 (referring to

the Jump Entities receiving and retaining, "[b]y virtue of the Terraform/Jump arrangement," benefits "directly traceable" to Plaintiffs' UST investments). And they allege that the Jump Entities violated ICFA (i) by failing to disclose conflicts of interest and self-dealing "in receiving discounted Luna" under the 2019 Loan Agreement, *id.* ¶ 109, and (ii) by "concealing [their] role in defending the 2021 peg," *id.*, and "refus[ing] to provide the market-making and liquidity services," *id.* ¶ 110, obligations that Plaintiffs allege the Jump Entities undertook in exchange for the LUNA they received under the 2019 Loan Agreement, *id*. ¶ 105; *see also id.* ¶¶ 38, 84 (alleging the Loan Agreements granted "Jump deeply discounted rights to acquire Luna in exchange for providing liquidity and peg-defense services").

Thus, by Plaintiffs' own allegations, the 2019 Loan Agreement "provide[s] the factual foundation for every claim asserted by [Plaintiffs] against [the Jump Entities]." *Int'l Ins. Agency Servs., LLC*, 2007 WL 951943, at *6. Accordingly, Plaintiffs should be "estopped from refusing to arbitrate [their] dispute when [their] entire case hinge[s] on [their] asserted rights under [the contract containing the arbitration clause]." *Id.* at *4 (internal quotation marks and citation omitted); *see also Leff v. Deutsche Bank AG*, 2009 WL 1380819, at *4 (N.D. Ill. May 14, 2009) (finding that, where plaintiffs claim "to benefit personally from the . . . agreements, principles of equitable estoppel dictate that Plaintiffs should be bound by the arbitration provisions in those same agreements"); *Masters v. Lowe's Home Ctrs., Inc.*, 2009 WL 1657925, at *3 (S.D. Ill. June 11, 2009) ("When a plaintiff relies on the terms of an agreement in its claims against the defendant, she will be equitably estopped from repudiating the arbitration clause of the agreement upon which she relies."); *Mengers v. Gulf Stream Coach Inc.*, 136 F. Supp. 3d 1006, 1011 (N.D. Ind. 2015) ("Because plaintiff seeks to benefit from the Service Agreement, she cannot avoid its arbitration clause . . . ."); *cf. Hostforweb Inc. v. Cloud Equity Grp. SIM LLC*, 2019 WL 6033648, at *3 (N.D.

Ill. Nov. 14, 2019) (holding that "[a]s a third-party beneficiary seeking to enforce the APA, Plaintiff is bound by all the provisions in the APA").[21]

And although Jump Trading and Jump Crypto did not sign the 2019 Loan Agreement, Plaintiffs should be estopped from arguing that those Defendants cannot invoke the arbitration clauses at issue. In their Complaint, Plaintiffs admit they seek to hold Jump Trading and Jump Crypto to the terms of the Loan Agreements on the basis that TMSL, the signatory, is their alleged alter ego. Compl. ¶ 17 (alleging that "Jump Trading and Jump Crypto's relevant obligations arose from agreements entered into by [TMSL], acting in its capacity as Jump Trading and Jump Crypto's alter ego"). As this Court previously recognized, "it would be manifestly inequitable to permit a party to claim that its opponent failed to perform a contractual duty and at the same time deny that the opponent is a party to the contract with an arbitration provision." *Lefkovitz*, 1998 WL 312001, at *3 n.1 (Bucklo, J.) (citing *Hughes Masonry Co*., 659 F.2d at 839).

### C. Plaintiffs' Claims Fall Squarely Within the Scope of the 2019 Loan Agreement's Broad Arbitration Clause

Plaintiffs' claims fall within the express, broad scope of the arbitration clause in the 2019 Loan Agreement, covering any "dispute [that] arises out of or relates to [the 2019 Loan Agreement], or the breach thereof." Ex. 1 § IX. As the Seventh Circuit has recognized, the terms "arising out of" and "relating to" indicate an "extremely broad" arbitration clause "capable of an expansive reach" and that such broad clauses "necessarily create a presumption of arbitrability." *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909–10 (7th Cir. 1999). This Court

[21] Even if Illinois law governed the question of whether Plaintiffs should be compelled to arbitrate, the result should be the same because Plaintiffs allege to be third-party beneficiaries of the Loan Agreements and, under Illinois law, "[a] third-party beneficiary is bound by the terms of the contract in the same manner as the parties are bound." *Streams Club, Ltd. v. Thompson*, 536 N.E.2d 459, 465 (Ill. App. Ct. 1989); *see also Elsasser v. DV Trading, LLC*, 444 F. Supp. 3d 916, 928 (N.D. Ill. 2020) (holding plaintiffs were estopped from avoiding arbitration where they sought "to benefit from the agreement containing the arbitration clause") (applying Illinois law).

likewise has found similarly worded arbitration clauses to be "very broad." *Lefkovitz*, 1998 WL 312001, at *3 (construing as "very broad" provisions requiring arbitration of all claims that "arise under, out of or in connection with or in relation to" the agreements).

Here, there can be no real dispute that Plaintiffs' claim for breach of the 2019 Loan Agreement—as part of the "Subject Contracts"—falls squarely within the arbitration provisions which, by their plain terms, apply to any dispute regarding "the breach" of those agreements. Ex. 1 § IX. And, as shown above, Plaintiffs' other common law and statutory claims all center on their allegations that the Jump Entities took on and subsequently violated purported liquidity obligations to Plaintiffs that arose from those agreements. *See supra* pp. 34–35, 37–39, 40–41. As such, those noncontractual claims also fall well within the broad arbitration provision here, which, as the Seventh Circuit recognized, should be read "broadly to include all manner of claims tangentially related to the agreement, including claims of fraud, misrepresentation, and other torts involving both contract formation and performance." *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002); *Patterson 357, LLC v. Heidelberg Materials Midwest Agg, Inc.*, 2024 WL 1301331, at *5 (N.D. Ill. Mar. 27, 2024) (noting courts in this Circuit routinely interpret the language "arising out of and relating to" as "encompassing claims even tangentially related to the agreements").

### D. If the Court Compels Arbitration of Only Some Claims, Any Remaining Claims Should Be Stayed

If the Court were to find that only some of Plaintiffs' claims should be arbitrated, it should exercise its discretion to stay the nonarbitrable claims pending resolution of the arbitration to avoid inconsistent rulings and to potentially narrow the issues. *See Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 972 (7th Cir. 2007) ("The factors that bear on this inquiry include 'the risk of inconsistent rulings, the extent to which parties will be bound by the arbitrators' decision,

and the prejudice that may result from delays . . . . [D]istrict courts actually may prefer to stay the balance of the case in the hope that the arbitration might help resolve, or at least shed some light on, the issues remaining in federal court." (internal citation omitted)).

Here, the arbitral tribunal would have to decide many factual issues that overlap with any nonarbitrable claims. As shown *supra*, each of Plaintiffs' four claims—for breach of contract, conversion, unjust enrichment, and violations of ICFA—requires finding that the Jump Entities undertook some contractual obligation to provide funding for UST investors' sell orders and thereafter breached that obligation. Accordingly, absent a stay, there is a real risk of inconsistent rulings by this Court and the arbitral tribunal regarding the existence and breach of that obligation. *See*, *e.g.*, *Digisound-WIE, Inc. v. BeStar Techs., Inc.*, 2008 WL 11517597, at *3 (N.D. Ill. May 30, 2008) (staying case pending arbitration where all claims depended on material issue of parties' obligations under contract with arbitration clause); *Derse, Inc. v. Haas Outdoors, Inc.*, 2009 WL 2228736, at *4 (E.D. Wis. July 21, 2009) (same). At the same time, granting a stay here would not prejudice Plaintiffs because the question of the Jump Entities' alleged liquidity obligations—a central issue that pervades Plaintiffs' every claim—would be addressed in arbitration without undue delay. *See*, *e.g.*, *Am. Cas. Co. of Reading, Pennsylvania v. Schilli Transp. Servs., Inc.*, 2009 WL 10722244, at *6 (N.D. Ind. Feb. 12, 2009) (granting stay and finding no prejudice from delay in adjudicating lawsuit where "issues that would necessarily have to be resolved by this Court would be resolved through the arbitration"); *see also Digisound-WIE, Inc.*, 2008 WL 11517597, at *3 (granting stay and finding minimal prejudice to plaintiff who chose to plead arbitrable contract claims and thus "created the possibility that the court, in its discretion, could stay all claims").

Thus, while the Court should compel arbitration as to all of Plaintiffs' claims, in the event that it compels arbitration of only some of them, staying the nonarbitrable claims would promote judicial economy and the efficient conduct of the proceedings.

## CONCLUSION

The Court should dismiss the Complaint against Jump Trading, Jump Crypto, and TMSL. If not dismissed, the Court should compel Plaintiffs to arbitrate their claims.

Dated: August 3, 2026

Respectfully submitted,

KOBRE & KIM LLP

/s/ *Jonathan D. Cogan*

Jonathan D. Cogan
Steven W. Perlstein (*pro hac vice* forthcoming)
Igor Margulyan (*pro hac vice* forthcoming)
Daisy Joo (*pro hac vice* forthcoming)
800 Third Avenue
New York, NY 10022
Telephone: (212) 488-1200
jonathan.cogan@kobrekim.com
steven.perlstein@kobrekim.com
igor.margulyan@kobrekim.com
daisy.joo@kobrekim.com

*Attorneys for Defendant Jump Trading, LLC, Jump Crypto Holdings LLC, and Tai Mo Shan Limited*